CASES IN CHANCERY, 1914.        369

*83 N. J. Eq.*    Nat'l Biscuit Co. *v.* Pacific Coast Biscuit Co.

NATIONAL BISCUIT COMPANY

*v.*

PACIFIC COAST BISCUIT COMPANY et al.

[Decided June 4th, 1914.]

1. One may not palm off his goods as the goods of a rival and thereby cheat the purchasing public and injure the business of the rival.

2. A manufacturer of bakery products, which adopted as its trade mark a seal known in the trade as "In-er-seal," which seal was placed on each end of paper cartons containing the products, and had become an identifying mark of its products, thereby acquired the right to the exclusive use of the seal, and a rival manufacturer would be restrained from subsequently adopting a seal of similar general appearance, and similarly placed on its cartons, so as to mislead the purchasing public.

3. A manufacturer of bakery products, which adopted the word "Uneeda" displayed on paper cartons containing its product and so advertised its business as to make the name identify its product, thereby acquired the exclusive use of the word as applied to its product, and a rival could not use on its product the word "Abetta" displayed on its cartons and thereby confuse the purchasing public.

4. A manufacturer suing to restrain unfair competition need not show intentional fraud, or that anyone had been actually deceived, but need only show that the marks, words, or other special arrangement of a rival manufacturer are such as will likely mislead persons in the ordinary course of purchasing goods and inducing them to suppose that they are purchasing the article of the manufacturer.

5. A paper carton constructed by superimposing on the cardboard carton blank a sheet of waxed paper of the size and shape of the blank, so that, when folded, it will form a unit box and possess the capacity of preserving the contents equally with hermetically sealed tin boxes and bundle packages, may not be exclusively appropriated by a manufacturer as devised to mark and indicate its product, but a rival manufacturer may use similar cartons and bundle packages without being guilty of unfair competition.

6. Where a manufacturer of bakery products has adopted for its products paper cartons of various sizes and trade marks placed on each end thereof and trade names, such as "Uneeda Biscuit," "Uneeda Milk Biscuit," "Oysterettes," "Marshmallow Dainties," "Cocoanut Dainties," "Oatmeal Crackers," &c., a rival manufacturer will be restrained from adopting any seal on its cartons or trade names which are calculated to deceive the purchasing public, but it will not be restrained from selling

such cartons with their asserted trade mark thereon so differentiated in general appearance and application from the manufacturer's trade mark that it could not deceive the ordinary purchaser, nor will the rival manufacturer be restrained from selling cartons of the size, weight, and shape of the manufacturer's packages, nor from using the representative colors as wrappers for such packages, provided the packages are so differentiated in general appearance from the manufacturer's packages that they will not deceive the ultimate purchaser.

On bill, &c.   On final hearing on pleadings and proofs.

*Messrs. Vredenburgh, Wall & Carey, Mr. Charles K. Offield* (of the Illinois bar) and *Mr. Earl D. Babst* (of the New York bar), for the complainant.

*Messrs. Collins & Corbin* and *Mr. William D. Fenton* (of the Oregon bar), for the defendants.

WALKER, CHANCELLOR.

The object of this bill is to restrain unfair competition in trade.

The complainant and defendant companies are corporations organized under the laws of this state. Both are engaged in the same line of trade—the manufacture and sale of bakery products. The business of the defendant company is confined to the Pacific coast states and adjacent territory, while the field of activity of the complainant company is nation-wide. The complainant's career commenced in 1898, when it acquired some of the leading bakery plants in the country, with which it began operations. It already had a market for its goods, brought to it by these plants, and by the exercise of a superior order of scientific and mechanical intelligence and of commercial acumen and industry, acquired a wide and enviable reputation for the high quality of its products. A market for these wares was established in the defendant's territory shortly after the complainant started business in 1898.

The principal innovation made in the bakery line by the complainant is that of housing and transmitting to the ultimate consumer bakery products with a minimum of deterioration, and

practically as they leave the ovens. This is accomplished by the use of paper cartons. Up to the complainant's advent, shipments were mainly in "bulk"—that is, in barrels and wooden boxes. Paper cartons, of the shoe-box style, with loose paper lining, and hermetically sealed tin boxes, were also used, but only to a very limited extent. The tin boxes were commercially too costly and the shipment in bulk was objectionable because of the tendency of the contents to absorb moisture and deleterious and offensive odors, and to breakage. Uncleanliness in the handling by the retailer was also to be reckoned with.

The paper cartons adopted by the complainant were much smaller than those theretofore used and were of a size to permit of sales at popular prices—five and ten cents per package. These cartons are constructed by superimposing upon the carton blank, made of cardboard, a sheet of wax paper of the size and shape of the blank, which, when folded, form a unit box, and, it is said, possess the quality and capacity of preserving the contents equal to the hermetically sealed tin box. The cartons are of various sizes and shapes, adapted to the forms of the proposed contents; and to identify the contents as its products, and to distinguish the same from those of other dealers, the complainant adopted a trade mark and a variety of trade names for its various products, and peculiar and distinctive labels and wrappers to envelope the cartons, all of which, it is claimed, the defendant fraudulently simulated, to the injury and damage of the complainant's trade.

The alleged infringement of fifteen widely different styles of cartons and carton wrappers and applied trade names, for as many kinds of crackers or biscuits; the methods of construction of the carton, and of the form of bundle package of assembled cartons, as well as the trade mark, is involved in this litigation.

The law relating to fraudulent or unfair competition between traders is so firmly established and has been so lucidly illustrated and defined by the courts of England and of this country, that extended citation of authorities will be profitless. The underlying principle that no man has a right to palm off his wares as those of another, thereby cheating the purchasing public and filching the business of a rival, is so essentially an element of natural justice and so solidly imbedded in our jurisprudence,

that all that is necessary to quicken a court of equity, is to show that in the particular instance the offence has been committed. The cases cited by counsel in their briefs exemplify the illimitable conditions and circumstances under which this simple doctrine requiring men to be honest towards each other may be invoked.

The case of *Wirtz* v. *Eagle Bottling Co., 50 N. J. Eq. 164,* is a striking example of the adaptation of the principle to unfair competition in the use of imitative labels and wrappers. The opinion in that case so fully covers the whole scope of the law applicable to the facts presently to be considered, and furnishes so clear a guide, that I am persuaded to quote from it *in extenso.* The complainant, in that case, by his industry and fair dealing, had built up a large and valuable trade as a bottler of beer and identified his goods by a peculiar and distinctive label, which label the defendant substantially copied. Vice-Chancellor Van Fleet, in granting a preliminary injunction, subsequently made perpetual (at *p. 166*), said:

"If we speak with accuracy, these labels cannot be called trade marks, but they serve substantially the same purpose. They are the marks by which the complainant's goods are distinguished in the market from all like goods put upon the market by other persons, and are, for that reason, according to many decisions, just as much under the protection of the law as trade marks are. The law protects them for the same reasons and in precisely the same way that it does trade marks. The leading principle of the law on this subject is, that no man should be permitted to sell his goods on the reputation which another dealer has established in the market for his goods, and this principle applies with equal force to the case where the goods of such other dealer are known in the market by a label as it does to the case where they are known by a mark which is strictly a trade mark. No dealer can lawfully adopt the label of another dealer, or one so near like it as to lead the public to suppose that the article to which it is affixed was put upon the market by such other dealer. *Miller Tobacco Manufactory* v. *Commerce, 45 N. J. Law 18, 24.* The reasons upon which this rule rests were stated by Mr. Justice Knapp, in the case just cited, substantially as follows: While

the markets are open and free to all, and fair competition should be encouraged, still every dealer must be required for the protection of the public and to promote fair dealing, to depend for his success upon his own reputation and the quality of his own productions. If he were allowed to deal under false colors and sell his productions for those of others, the result would be that he would not only cheat the public, but also defraud him whose right place in the market he filled with spurious goods. Such competition would not be fair competition—it would be closer akin to piracy.

\* \* \* \* \* \* \* \* \* \*

"The defendant's labels were prepared under the direction of its general manager. \* \* \* He further says, that in designing the defendant's labels he had no purpose or design of palming off the defendant's goods for those of the complainant. Admitting all this to be true, it is manifest it constitutes no defence. The vital question in cases of this kind is not what did the defendant mean, but what has he done? The legal quality of an act, resulting in injury, must be decided not by the motive with which it was done, but by the consequences which have necessarily resulted from it. The law, in civil cases, does not attempt to penetrate the secret motive which induced the act brought in judgment, but judges of its legal quality solely by the consequences which have actually and necessarily proceeded from it. It is no less a dictate of justice, than of sound reason, that every person must be understood to have intended to do just what is the natural consequence of his act deliberately done. \* \* \* For it is a matter of common knowledge that the ordinary buyer does not, as a general rule, exercise as much caution in buying an article, for which he pays a few pennies, as he does in purchasing a more valuable thing. The instances are very rare, I suppose, where a purchaser exercises as much care in buying a bottle of beer as he does in buying a bottle of whiskey, a box of cigars, or a hat or a coat.

"\* \* \* Where, as in this case, the subject-matter of the controversy is labels, and the question is, whether one is a fraudulent simulation of the other, the decision must always, to a large extent, be controlled by the evidence furnished by the labels

themselves. As a general rule, they constitute the very best evidence of which the case is susceptible. That is the case here. A comparison of these labels, whether made singly or in a group, shows conclusively, as I think, that the use of the defendant's labels constituted a plain violation of the complainant's right. It is difficult to believe that one set of labels could have been made so near an exact copy, in all their special characteristics, of another set without an effort at simulation."

In 1900, the complainant, the National Biscuit Company, adopted as its trade mark a sign or symbol known in the trade as the "In-er-seal" or "In-er-seal trade mark." This seal is square, and of a peculiar shade of red, with clipped corners and white lines thereon forming an ellipse, divided equally by a horizontal line, from which extends a perpendicular line halving the upper half of the ellipse, with two horizontal lines crossing the perpendicular line above the ellipse. This configuration of white lines on the seal is said to have been the sign and mark of the first printers in the early period of that art, taken by them from the Catholic Church, and by the latter from Paganism, and signifies the triumph of the spiritual over the material world. These seals were placed upon each end of all the paper cartons containing the baker products placed on the market by the complainant, and in addition to the purpose they serve in sealing the cartons, are an attractive and conspicuous feature of the carton wrapper.

The initial trade name coined and applied by the complainant to an important part of its cracker output is "Uneeda," or "Uneeda Biscuit." The association of the "In-er-seal" trade mark and the name "Uneeda Biscuit" formed the slogan of the complainant's business. By the expenditure of a stupendous amount of money in lavish, but judicious, advertisement, they became known to almost every man, woman and child in this country as the identifying mark and name of the complainant's goods. I quite agree with the statement of one of the witnesses who testified that

"Uneeda Biscuit and the In-er-seal, it may be said, are woven into the fabric of the National Biscuit Company. In fact, they are the business. As to their value they are probably worth millions of dollars

CASES IN CHANCERY, 1914. 375

*83 N. J. Eq.*    Nat'l Biscuit Co. *v.* Pacific Coast Biscuit Co.

to the National Biscuit Company. Its physical properties such as plants, machinery, and so forth, if destroyed, could be replaced within a reasonably short time, while the loss of the In-er-seal and Uneeda Biscuit and the good will that goes with them would be, if not irretrievable, at least a very great calamity."

The defendant the Pacific Coast Biscuit Company succeeded to the business of the Portland Cracker Company in 1899. The latter-named company had been engaged in the cracker baking business at Portland, Oregon, since 1886, and in the carrying on of its business used a variety of labels, some descriptive of the package contents and others to identify its various kinds of cracker and biscuit output, and to mark them as the product of that company, but none that bore any resemblance to the "In-er-seal," the label of the complainant; none square in shape, with clipped corners, a red field with white marking and applied to either end of paper cartons of the dimensions of those of the complainant. When the defendant bought the property of the Portland Cracker Company it took over these seals and for a time used them, substituting only its name for that of its predecessor, until about the year 1903, when they were practically discarded, and a seal known as "Gold Coast End Seal" was adopted, which was also far unlike the complainant's "In-er-seal." In 1907 this one was also abandoned, and red-end seal termed "Swastika Red-end Seal," with clipped corners and white line markings upon a background of red of exactly the same shade as the complainant's seal, and which is the infringing seal complained of, was substituted. It is described in the record as a symbol of prehistoric origin, emblematic of a beneficent deity, eternal life, benediction and blessing, good wishes and good augury, and was and is used by Indian basket makers and blanket weavers, potters and silversmiths, and is known as the Navajo Indian cross, and was well known and in use as a religious emblem in India fifteen centuries before the Christian era. Like the complainant's "In-er-seal" it is being used by the defendant on both ends of paper cartons of identically the same size and shape as the complainant's cartons. The two labels, the "In-er-seal" and the "Swastika" differ only in their markings. Laid side by side, and disassociated from the cartons, the re-

semblance is not marked, but when the defendant's seals are applied to the end of cartons resembling, as to size, shape, wrapper application and euphony of coined names, the similitude is striking, and when thus associated is of a character calculated to mislead and deceive the unwary and unsuspecting purchaser.

· The federal courts have had occasion, by injunction, to protect this complainant in its seal and seal application against an infringing seal, under circumstances much like those present in this case. *Ohio Baking Co.* v. *National Biscuit Co., 127 Fed. Rep. 116; National Biscuit Co.* v. *Swick, 121 Fed. Rep. 1007.*

The claim of the defendant that it and its predecessor, the Portland Cracker Company, used a red-end seal, square in outline with clipped corners, upon the end of cartons, to denote its wares prior to the adoption by the complainant of its in-er-seal, is not sustained by the testimony. Moreover, the red-end seals which were used by the defendant were, as I have already stated, discarded for the "Gold Coast Seal" in 1903.

Inspection and comparison of the cartons of the complainant and defendant, of the nomenclature and wrapper embellishments, and of the red-end seal application, are sufficient to satisfy me of the copying by the defendant of the complainant's trade name and carton and carton wrappers. I, cannot conveniently deal with the cartons collectively, nor will it be possible, within the limits of these conclusions, to advert in detail to all of the points of similarity between the two sets of cartons to which my attention has been called, and, therefore, reference will only be made to the prominent features.

Generally, as to size, shape and capacity (and the fifteen cartons of the complainant differ in these respects), it may be said that the defendant's cartons are exact and substantial counterparts of the complainant's. The red-end seal on both ends of the infringing cartons, and the superimposed wax-paper interior, are also uniform points of likeness. The resemblances in other respects, submitted by the complainant, I will take up in the order in which the infringements are charged in the bill.

1. This relates to the red-end seal already disposed of.

2. *Complainant's "Uneeda;" Defendant's "Abetta" Biscuit.*— The wrappers of the two cartons to which these words are applied

are of a dark body color, with white parallelogram decorations. The style of type and the location of the display of the name of the biscuit and of the reading matter is the same, and the latter conveys the same meaning. That the complainant is entitled to the exclusive use of this coined word, as applied to crackers or biscuits, seems to me to be beyond question, and this extends to any word similarly applied which rings with the same tone. "Abetta" was coined by the defendant with knowledge of the use and application by the complainant of the suggestive name "Uneeda." This, coupled with the circumstances of two consecutive abandonments by the defendant of similar and graduating, but less offensive, infringing cartons, and the obvious purpose of creating the impression of an alliance between the two biscuits, and of superiority in that of "Abetta" (a better than "Uneeda"), evinces that the selection by the defendant of the word "Abetta" was intended to bring to it profit from a confused purchasing public.

3. *Complainant's "Nabisco;" Defendant's "Parfait" and "Fiesta."*—The word "Nabisco" is made up practically of the initial syllable of each of the words "National Biscuit Company." Both packages are of tin. The contents of each is a sweet cracker. The color scheme of the wrappers is the same. It is of a white background with red and gold decorations—clearly a case of copying.

4. *Complainant's "Social Tea Biscuit;" Defendant's "Elite Biscuit."*—There is a pronounced resemblance in the decorations and appearance of these two packages. "Social" and "Elite" convey the same impression, and the substitution of the latter for the former on the defendant's cartons evinces but a single motive—confusion.

5. *Complainant's "Uneeda Milk Biscuit;" Defendant's "Abetta Milk Biscuit."*—These are as nearly alike as "two peas in a pod." The answer of the defendant respecting its carton, and its statement that it has stopped making it, impliedly confesses copying.

6. *Complainant's "Oysterettes;" Defendant's "Toke Point Oysterettes."*—This word "oysterettes" was coined by the complainant and applied to a particular brand of its crackers, in the

year 1901. The word is indicative of the contents of the cartons. Up to 1909 the complainant had marketed some fifty millions of these carton contents, under this trade name, and, on the Pacific coast, in excess of a million. The claim of the defendant that its predecessor originated and applied this name to a brand of its goods prior to the adoption by the complainant, is not borne out by the testimony. The prominent eye-object on the carton is, of course, the word "Oysterettes." The defendant's "Toke Point" is printed with type comparatively obscure. The boxes are of the same size.

7. *Complainant's "Fig Newtons;" Defendant's "Fig Sultana."*—The copying here is manifest. The body color of the wrapper in each carton is white, with gold scroll work embellishments and red-end seal. Obviously, the defendant's carton is an imitation.

8. *Complainant's and Defendant's "Marshmallow Dainties."*—The complainant was the first to originate and apply this trade name to one of its carton bakery products. This was in 1905. Up to the time of the taking of the testimony, in 1909, it had sold under this name some five million of these carton contents. The exact trade name has been appropriated by the defendant and is the subject of complaint.

9. *Complainant's "Zu Zu;" Defendant's "Hoo Hoo" Ginger Snaps.*—"Zu Zu" and "Hoo Hoo" are merely catch words, with the same general sound when spoken, and not widely different to the non-discriminating when printed. The words, respectively, on the two cartons, have the same general appearance, and with the box arrangement and red-end seals, show similarity, and leave the impression that imitation was intended. "Zu Zu," as a trade name, was adopted by the complainant in 1901, and applied to ginger snaps. The sale of these cartons to June, 1909, was approximately one hundred million, and over a million in the Pacific coast states. The defendant claims the right to the use of "Hoo Hoo" because of prior appropriation by its predecessor. The record does not satisfy me that this contention is well founded.

10. *Complainant's "Frotana;" Defendant's "Maritani" Fruit Biscuit.*—Similarity of size of cartons, of wrapper coloring, of

red entering largely into the decorations, the red-end seal application, the fruit biscuit contents; and the confusion between the two names as to pronunciation of their ending syllables, taken as a whole, evidence copying.

11. *Complainant's and Defendant's "Cocoanut Dainties."*— This term was originated by the complainant as a mark for one of its products. The trade name has been copied. Both cartons are of the same size. The general arrangement of the lettering, the light color of the two boxes and the red-end seal, all tend towards confusion.

12. *Complainant's "Old Time Sugar Cookies;" Defendant's "Old Fashioned Sugar Cookies."*—The only change made by the defendant in appropriating this trade name is the substitution of the word "fashioned" for the word "time," both of which, in connection with the remainder of the name, have the same significance. The same size and shape of the carton, of the white colored wrappers, and the application of the red-end seal, complete the likeness.

13. *Complainant's "Celebrated Zwieback;" Defendant's "Genuine Zwieback."*—These packages are approximately of the same size and shape. The German and English printed matter bears comparatively the same appearance and meaning. Aside from this and the red-end seal application, there does not appear to be other similarity.

14. *Complainant's "Fancy Assortment;" Defendant's "Fancy Assorted Cakes."*—The size and dress of these cartons have a single eye appearance. The term applied to the defendant's carries with it the same meaning as that adopted by the complainant. The decorations as to red border lines are attracting similarities.

15. *Complainant's "Oatmeal Crackers;" Defendant's "Abetta Oatmeal Crackers."*—Both wrappers are green. The shade of the defendant's varies slightly from that of the complainant's. The prominent sight-object on both is "oatmeal crackers." On the defendant's, in dim type and small print, apparently intended not to be readily observed, is the word "Abetta."

16. *Complainant's and Defendant's "Animal Box."*—These

seem to be counterparts, even to the cord handle.     Here the copying is complete.

The history, as disclosed by the voluminous record, of the progressive steps of the defendant in the work of seal imitation, which culminated in the adoption of the "Swastika" seal, read in connection with the history relating to the constant advance in copying. and the gradual approach by the defendant in the use of cartons and wrappers, in appearance like those of the complainant, convinces me that the "Swastika" red-end seal was fashioned and applied by the defendant to the ends of its cartons, and that these cartons and wrappers and trade names, so much like those of the complainant, were simulated by the defendant for no other purpose than to mislead the public into purchasing its goods for those of the complainant, and thus to purloin the complainant's business.     I cannot escape this conclusion.

The Portland Cracker Company and the defendant built up a cracker trade, with seals of a distinctive type, the more prominent and generally used one of which was a red seal with a boy sitting on a cracker box, apparently exhibiting a cracker in each hand, dividing the words "Our Brand."     The defendant also created its own style of cartons and wrappers to individualize and distinguish its output. After the complainant entered the industry and introduced its novel and successful methods, a campaign of simulation upon the part of the defendant began. Seals were abandoned and cartons and carton wrappers of the defendant's selection and origin were from time to time discarded and eventually replaced by those the subject of this suit. The deadly. parallel between the entire line of the complainant's and defendant's seals, cartons, carton wrappers and trade names is so conspicuous that it requires no great perspicuity to observe that the defendant's present methods of displaying and vending its wares are not attributable to any desire on its part to honestly build up a trade of its own, but rather that they are the culmination of a premeditated and single purpose of dealing under the cover of the good will of a successful rival.

It is unnecessary, in these passing-off cases, to find intentional fraud, or that it be shown that anyone has been actually de-

ceived, to entitle a complainant to protection. It need not appear that there is precise copying of any one of the cartons of the complainant. In *Ball* v. *Siegel, 116 Ill. 137*, it was said:

"It is true that in cases of this kind, as a general rule, exact similitude is not required to constitute an infringement, or to entitle the complaining party to protection, but if the form, marks, contents, words or other special arrangements or general appearance of the words of the alleged infringer's device are such as would be likely to mislead persons in the ordinary course of purchasing the goods, and induce them to suppose that they were purchasing the genuine article, then the similitude is such as entitles the injured party to equitable protection, if he takes seasonable measures to assert his rights and prevent their continued invasion."

And Vice-Chancellor Van Fleet, in the *Wirtz Case* (*50 N. J. Eq. 168*), puts it thus:

"If it appears that the resemblance between the two labels is such that it is probable, in the sale of the goods of the parties, the one will be mistaken for the other, enough is shown to make it the duty of the court to interfere. *Edelsten* v. *Edelsten, 1 De G. J. & S. 185, 200.* As was said by Mr. Justice Clifford, in *McLean* v. *Fleming, 96 U. S. 245*—a case in which all the principles pertinent to the case in hand were stated with great clearness and fullness—no rule as to what degree of similarity must exist in order to constitute an infringement can be laid down which may be applied to all cases. All that can be done in that record is to say that where the similarity is sufficient to convey a false impression to the public mind, and is of a character to deceive the ordinary purchaser buying with the caution usually exercised in such transactions, there sufficient ground exists to entitle the injured person to redress. There are cases which lay down a more liberal rule in favor of persons claiming protection, and declare that if the resemblance is only such as is calculated to deceive the careless and unwary, a sufficient degree of similarity will exist to justify the court in interdicting the use of the counterfeit."

The facts in the case *sub judice,* in my judgment, abundantly establish that the defendant's cartons and carton wrappers, its

seal, trade mark and trade name, associated as they are, tend towards deceiving and are likely to deceive the purchasing public into the belief that the defendant's crackers and biscuits are those of the complainant.

The carton formation and the bundle packages are not the subject of exclusive appropriation by the complainant as devices to mark and indicate its products. The cartons known as the "Peters' Patent" were declared in *Union Biscuit Co. et al.* v. *Peters, 125 Fed. Rep. 601,* as not a patentable invention. There can, of course, be no monopoly of the shape, size or capacity of a box. The lining of such boxes with wax or paraffine paper superimposed thereon, and forming a unitary structure capable of inter-folding at the ends, for the enclosing of perishable goods, is a system or method which it seems to me must necessarily be common to all bakers. I have not a doubt but that the complainant used this form of package before the defendant, and that the secondary purpose of the defendant in adopting it was a part of its general plan of imitating the complainant's line of operation. Nor do I think it can be disputed that, in connection with the other simulations which have already been pointed out, this particular one failed of its mission. This may also be said of the bundle package. Instead of using wooden boxes to enclose for shipment an assembled assortment of filled cartons, the complainant used paper shaped into box form. The only service in this case of the imitation of the carton package and the bundle package is to emphasize the trend of the defendant towards copying the complainant's style.

There will be an injunction restraining the defendant, including the director-defendants (for the sake of convenience I have heretofore referred to all of the defendants as one), from putting up and selling or offering for sale:

(*a*) Any carton of bakery products having thereon an imitation of complainant's "In-er-seal" trade mark calculated to mislead or deceive, like the defendant's "Swastika" trade mark. This shall not be construed to restrain the defendants from selling such cartons with their asserted trade mark thereon, provided the trade mark is so differentiated in general appearance

and application from the complainant's trade mark that it is not calculated to deceive the ultimate ordinary purchaser.

(*b*) Any carton of bakery products having thereon an imitation of complainant's "Uneeda Biscuit" trade name calculated to mislead or deceive, like those on defendant's carton "Abetta Biscuit."

(*c*) Any carton of bakery products having thereon an imitation of complainant's trade names, "Uneeda Milk Biscuit," "Oysterettes," "Marshmallow Dainties," "Cocoanut Dainties," and "Oat Meal Crackers," calculated to mislead or deceive, like those on defendant's cartons, respectively, "Abetta Milk Biscuit," "Toke Point Oysterettes," "Marshmallow Dainties," "Cocoanut Dainties," and "Abetta Oat Meal Crackers."

(*d*) The particular forms of cartons or packages referred to in the bill of complaint and identified therein as "Complainant's Exhibit Defendant's Abetta Biscuit and Red-end Seal Carton No. 2," and "Complainant's Exhibit Defendant's Infringing Packages Nos. 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15 and 16 respectively," which shall by reason of the collocation of size, shape, colors, lettering, spacing and ornamentation, present a general appearance as closely resembling complainant's exhibits respectively referred to in the bill of complaint and marked as "Complainant's Exhibit Complainant's Cartons Trade Name Uneeda Biscuit Wrapper No. 2," and "Complainant's Exhibit Complainant's Cartons Nos. 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15 and 16," as do the said defendant's respective infringing packages afore-mentioned, but this shall not be construed as restraining the defendants from selling packages or cartons of the size, weight and shape of complainant's packages, nor from using the respective colors as wrappers for such packages, provided such packages are so differentiated in general appearance from said complainant's respective packages that they are not calculated to deceive the ultimate ordinary purchaser.

The complainant's prayer for an accounting will be denied upon the grounds and for the reason stated by Vice-Chancellor Stevenson in *International Silver Co.* v. *William H. Rogers Corporation et al., 66 N. J. Eq. 140.*

The complainant is entitled to costs.