This is a suit to restrain the continued infringement of complainant's trade-mark, registered in the United States patent office, and to restrain the unfair competition that inheres in the defendant's use of a similar trade-mark to stamp its own product. In addition to the injunctive relief sought, complainant in its bill prayed for discovery concerning the products upon which the defendant stamped or impressed the allegedly infringing trade-mark and concerning the profits made by the defendant from those products, and prayed further that the defendant be decreed to account and pay unto complainant the profits realized by the latter from the dressing and dyeing of those fur skins and pelts upon which the defendant stamped or impressed the infringing trade-mark.
There are no controverted facts in this case, save the ultimate fact of infringement. All the facts alleged by complainant in support of the ultimate fact of infringement were admitted by the defendant's stipulation filed in the cause. That stipulation provides that:
"The defendant hereby admits all the allegations of fact contained in the bill of complaint but does not admit any conclusions of law nor the allegation that defendant's trade-mark infringes upon complainant's trade-mark nor the allegation that complainant is entitled to the relief prayed for. The matters so not admitted are submitted to the court's determination."
The stipulation further provided that on the return of the order to show cause, allowed on the filing of the bill, both parties might submit skins and advertising literature bearing the several trade-marks set up in the bill of complaint, and *Page 54 
that such skins and advertising literature should constitute evidence in the cause, and that:
"Upon the court's comparison of the respective trade-marks and upon the within stipulation the court shall finally determine complainant's right to relief and shall enter its final decree accordingly. A final hearing in any other form is hereby distinctly waived by both parties."
The facts appearing in the bill, admitted by the defendant's stipulation, establish that complainant's business has been conducted continuously since 1896; until 1919 by the copartnership of A. Hollander Son and since 1919 by complainant company as the successor in interest to the partnership business. That business consists of receiving from customers furs and skins in a raw state and by means of highly skilled labor and the application of secret formulae and processes converting those skins into finished fur products ready to be made into fur garments. That business is commonly called fur dressing and dyeing. The bill alleges that for more than a quarter of a century the excellence in quality of complainant's products has been universally recognized not alone by dealers, manufacturers and retailers but also by the ultimate consumer. The bill also establishes that it is a common thing for women negotiating for the purchase of a fur garment to ask that the inner lining be opened so that inspection might be had of the dyer's trade-mark appearing on the reverse side of the fur skin. For over a quarter of a century complainant and its predecessor firm have stamped and impressed their trade-marks on the skins dressed and dyed by them. This practice is not peculiar to complainant but obtains generally in the fur industry, each dyer stamping his own distinctive trade-mark on the skins dyed by him. Such stamping of the trade-mark on the skin itself enables the retail purchaser to recognize the product of any particular dyer whose trade-mark is known to him, and also enables the dealer and the manufacturer to distinguish the products of each dyeing concern. Because of such stamping of trade-marks on the skins themselves both confusion and deception are avoided.
One of the principal products put out by complainant is a *Page 55 
muskrat, sheared and dyed black so as to resemble Alaskan seal. Complainant and its predecessor firm have been producing that item continuously since 1913. There are other concerns that have been producing that same kind of article and it has borne for a great many years (at least since 1908) the trade name "Hudson Seal." Complainant's Hudson seal product is highly regarded and has been greatly in demand by consumers, so much so that complainant's trade-mark impressed on the backs of skins has become known to the retail purchaser and is associated in the latter's mind with the complainant's product. That trade-mark, which complainant seeks to protect by this litigation, has been stamped by complainant and its predecessor upon all their Hudson seals dressed and dyed from 1913 to the present time. That trade-mark, though so used continuously from 1913 to the present time, was not registered until recently. On February 28th, 1933, it was duly registered with the commissioner of patents of the United States and a certificate of registration issued to complainant, which certificate is by law effective for twenty years from the date of registration.
It is established by complainant's bill and defendant's admission that since 1913 complainant's trade-mark has been extensively advertised not only in the trade by trade advertising but also to the consumer public by advertisements in daily newspapers and magazines and by exhibitions in department stores, museums and educational institutions, and that since 1913 that trade-mark has been stamped on more than seventy-five million muskrat skins dressed and dyed into Hudson seal. Complainant alleges that in consequence of this (and the court can well believe it aside from the fact that the defendant has admitted the allegation) there abides in the mind of the buying public a general impression and recollection of complainant's trade-mark and that the trade-mark is to the public mind suggestive of complainant's Hudson seal product and of its factories as the product's place or origin.
The defendant company commenced the production of Hudson seal in 1922 and used the trade-mark set forth in paragraph 8 of the bill of complaint, a trade-mark closely resembling complainant's trade-mark. The use, however, was a *Page 56 
very short one because defendant abandoned its Hudson seal business in 1922. From 1922 until July, 1934, the defendant produced no Hudson seal. For the first six years of that period and for reasons of its own it did not deal in Hudson seal. From September, 1928, to July 1st, 1934, the defendant made no Hudson seal because it was under contract with complainant not to do so until December 1st, 1933, and was also placed under a final injunction by this court entered in June, 1929, restraining it at the suit of this complainant from producing Hudson seal prior to July 1st, 1934.
In July, 1934, the defendant resumed the production of Hudson seal and in the prosecution of that business adopted and has been using since July 1st, 1934, the trade-mark complained of. That trade-mark defendant has been extensively advertising and also stamping it on the reverse sides of the skins processed by it. Those skins in turn have been converted into fur garments and distributed throughout the country. Complainant promptly protested in July and in August of 1934 against the use of the defendant's trade-mark, claiming it to be an infringement upon its own. The defendant's president promised to discontinue the use. That promise was not kept and complainant thereupon, by its counsel, protested by letter on September 26th, 1934, demanding that the use of the objectionable trade-mark be discontinued and threatening suit for an injunction if that were not done. Thereafter complainant made several efforts to prevail upon the defendant to stop the protested use. Defendant's president stalled along, postponing final answer to the protest, saying as recently as the end of February, 1935, that he might voluntarily discontinue the objectionable trade-mark and adopt another in its stead. Failing so to do the bill in this case was filed on March 13th, 1935.
Complainant charges in paragraph 12 of the bill (and this is not admitted by the defendant's stipulation but on the contrary submitted to the court's eye for determination) that the defendant's trade-mark is so similar to complainant's trade-mark in size, geometrical design and in general features as to confuse, mislead or deceive, or tend to have that effect upon, "the ordinary purchaser having but a general recollection of *Page 57 
complainant's trade-mark and not having presented to him at one and the same time that trade-mark and the defendant's simulating trade-mark." It is also charged that dealers and persons in the trade are likely to experience confusion in selecting skins, mistaking the defendant's for those of complainant. It is also charged that the close similarity between the two trade-marks furnishes to an unscrupulous dealer, manufacturer or retailer the opportunity of palming off the defendant's product for that of complainant.
In February of this year complainant made a change in the language appearing within its trade-mark. The change is set forth in paragraph 13 of the bill. I regard that change as unimportant, since the contest between these parties relates to the geometrical design and not to the language used. The complainant does not claim any exclusive or superior right in the use of the trade name "Hudson Seal." That trade name seems to be common property, used by all producers of "Hudson Seal" since 1908. At the oral argument had before me both sides limited the contest to the geometrical designs of the two trade-marks. On that occasion complainant offered and there were received in evidence two skins, one dyed by complainant and stamped with its trade-mark and the other dyed by the defendant and stamped with the latter's trade-mark. These two skins represented the product after it had been handled in a so-called "stretching process." The defendant offered in evidence and there were received two skins, representing the respective products of the parties and bearing their respective trade-marks, which skins, however, had not yet been subjected to the "stretching process." The defendant contended that such infringement as might appear from a comparison of the two trade-marks and such harm as might otherwise result was neutralized by the fact that within complainant's trade-mark appeared the name "Hollander" and in the defendant's trade-mark the name "Singer." I do not believe that the presence of the name "Singer" within the defendant's trade-mark can justify the use of the mark itself if geometrically it too closely resembles the complainant's mark. It is conceivable that there are many persons who might recall the mark and not the name. The defendant's *Page 58 
stipulation carried with it the admission that in the mind of the general buying public complainant's trade-mark is well imbedded (paragraph 7 of bill). I cannot perceive why in reason and fair dealing one trader should be permitted to adopt and use another trader's mark, simply because he annexes to that mark his own name. Were courts to permit that, it would put an end to private property in a trade-mark, a right which the courts have, independent of statute, zealously guarded. Apart from the foregoing considerations, an inspection of the four skins received in evidence demonstrates that on the two skins where the "stretching process" had already been applied the names of the respective concerns are greatly blurred, causing the outstanding thing to be the geometrical design and not the name.
The two trade-marks have been examined by me with great care. They are substantially alike in size and, but for the fact that the defendant has used straight lines in substitution for the curved lines appearing in complainant's trade-mark, the two designs are almost identical. By superimposing one design upon the other I was able graphically to perceive the slightness of the difference between the two designs and I was impressed with the fact that the defendant's mark was a studied attempt to simulate complainant's mark, creating some differences — it is true — but making the general resemblance an exceedingly close one. "Similarity, not identity, is the usual recourse, where one party seeks to benefit himself by the good name of another," said Mr. Justice Bradley in Celluloid Co. v. Cellonite Co.,32 Fed. Rep. 94, quoted in International Silver Co. v. William H.Rogers Corp., 66 N.J. Eq. 119 (at p. 138); affirmed with enlargement of restraint in 67 N.J. Eq. 646. What has been spoken of similarity in trade names may equally be said of similarity in trade-marks. The English cases referred to, but not cited, by Chancellor Walker in the opinion in the NationalBiscuit Case have, in attempting to delineate in physical terms the degree of resemblance necessary to warrant judicial interference, held that a trade-mark to be unlawfully taken need not be copied exactly nor need it be copied with slight variations, but that the use of a substantial portion of it will justify equitable *Page 59 
interposition. As was said by the master of the rolls in SingerManufacturing Co. v. Wilson, 2 Ch. D. 434, 443, "* * * what the court has to satisfy itself of is that there has been an essential portion of the trade-mark used to designate goods of a similar description."
The United States supreme court in the leading case of McLean
v. Fleming, 96 U.S. 245. 251, said: "What degree of resemblance is necessary to constitute an infringement is incapable of exact definition, as applicable to all cases. All that courts of justice can do, in that regard, is to say that no trader can adopt a trade-mark, so resembling that of another trader, as that ordinary purchasers, buying with ordinary caution, are likely to be misled."
Vice-Chancellor Van Fleet in Wirtz v. Eagle Bottling Co.,50 N.J. Eq. 164, after approving the principle of McLean v.Fleming, said: "For the purposes of this case, the rule laid down and enforced in McLean v. Fleming, supra, will be adopted as the true one. That declares that exact similitude is not required; in other words, that the counterfeit need not be afac simile of the genuine, but that if the counterfeit so closely resembles the genuine as to mislead ordinary purchasers, buying with the care usually exercised in such transactions, the use of the counterfeit should be prohibited. * * *." See, also,Hilton v. Hilton, 90 N.J. Eq. 564, 567, and cases there cited.
In the Hilton Case Mr. Justice Trenchard, speaking for our court of errors and appeals, said: "Similarity, not necessarily identity, of names is recognized as a basis for relief." CitingInternational Silver Co. v. William H. Rogers Corp., supra.
It might also here be mentioned that in the Hilton Case our court of appeals laid down the rule that "a nice discrimination is not expected from the ordinary purchaser."
In the instant case it was urged in behalf of the defendant that there was no evidence before me that complainant dealt with the ultimate consumer or buying public and that the evidence that was before me showed that complainant dealt only with jobbers, wholesalers and distributors and that the latter class of persons are not likely to be deceived. It was also stressed that there is no evidence before me to indicate *Page 60 
actual deception on the part of the buying public. With respect to the first of these contentions, it suffices to say that it has been held that the mere fact that the dealer or first buyer is not likely to be deceived does not excuse the protested simulation if in fact the ultimate consumer may be deceived. In the first of the Rogers Cases in this state (InternationalSilver Co. v. William H. Rogers Corp., 66 N.J. Eq. (at p.137), Vice-Chancellor Stevens pointed out that the defendant had sufficiently distinguished its goods from those of complainant "as far as jobbers, and possibly as far as retail dealers are concerned," and said: "If there were no other class of persons that might be misled, I would say that notwithstanding the imitation of the name the complainant was not entitled to an injunction. * * *. But the case is different when we come to the ultimate purchaser. * * * The law is well settled that if the manufacturer puts it in the power of the retailer to misrepresent, he is answerable for the probable consequences."
In the second of the Rogers Cases (International Silver Co.
v. Rogers, 72 N.J. Eq. 933 — at p. 938), Mr. Justice Trenchard, speaking for the court of errors and appeals, said: "In cases like the present one, it is elementary that the person to be considered is not the jobber or wholesaler, but the ordinary purchaser at retail."
In the case of Cauffman v. Schuler, 123 Fed. Rep. 205, the circuit court for the district of New Jersey held that: "It is not necessary that the resemblance should be such as would deceive first or intelligent purchasers. It is sufficient if it be calculated to deceive the unwary, the incautious or the innocent purchaser. Neither need the resemblance be so great that one would be deceived who should see the labels placed side by side. If an ordinary purchaser, looking at the article offered to him, would naturally be led, from the label attached to it, to suppose it to be the product of a rival manufacturer, and would purchase it in that belief, the court will enjoin the use of such article as fraudulent."
The rule last stated obtains generally. It was well expressed by the United States circuit court of appeals in the case ofWestern Oil Refining Co. v. Jones, 27 Fed. Rep. 2d *Page 61 205, as follows: "Upon the question of infringement, the test, as frequently announced by this court, is whether the alleged infringing trade-mark or label, taken as a whole, so farresembles the other mark or label as to be likely to be mistaken for it by the casual or unwary purchaser." (Italics mine.)
The question therefore must be considered from the angle of the ordinary purchaser, unaware of the differences existing between the two trade-marks and without his attention directed to such differences. It is hardly conceivable, certainly not likely, that both trade-marks would be exhibited to him by the dealer or middleman so as to enable him to exercise discretion and make selection. Such a purchaser is moved solely by his general impression and recollection. The United States district court in the case of Prichard Constance v. Aime Co., Inc.,5 F. Supp. 282, said: "This determination [speaking of similarity of sound or appearance or significance] is to be made with reference to the impression made on the ordinary purchaser by recollection, not by a comparison of the two words, placed side by side."
With respect to the defendant's contention that there is no evidence of actual deception or confusion on the part of the buying public, it is a sufficient answer to say that no such evidence is necessary. Our courts have held that: "Neither actual confusion nor actual fraudulent intent need be shown where the necessary and probable tendency of the defendant's conduct is to deceive the public and pass off his goods or business as and for that of the complainant." See Hilton v. Hilton, 90 N.J. Eq.
(at p. 567), and cases there cited.
Applying the foregoing principles to the facts in the case at hand, it is obvious that the defendant's trade-mark is deceptive. While it varies from complainant's trade-mark, as curved lines necessarily vary from straight lines, the resemblances are most pronounced. It seems to me that the resemblances, not the differences, control the question. The psychological effect upon the mind of the customer, relying on his general recollection of complainant's trade-mark, would be such that upon seeing the defendant's trade-mark on the back of the skin he would be easily misled into regarding and accepting it as the complainant's trade-mark, particularly if *Page 62 
the name within the trade-mark were blurred or obliterated. Even if the name of the dyer were legible it would in many instances be meaningless, where the customer's mind has retained an impression of the design but not of the name of the designer. There are other likely situations in which either deception or confusion would result on the part of the unsuspecting buyer. It is against all such situations that complainant is entitled to be protected.
The defendant's contention that the two trade-marks were not geometrically alike can be dismissed with the statement of Vice-Chancellor Stevens in Standard Table Oil Cloth Co. v.Trenton Oil Cloth and Linoleum Co., 71 N.J. Eq. 555, 558, that "it is not necessary to prove that the defendant's marks or figures are identical with those of complainant. * * *." In that case this court restrained the use of an ellipse, suggesting that upon complainant's protest the defendant should have abandoned the ellipse and substituted therefor some other geometrical figure.
In the case of Ohio Baking Co. v. National Biscuit Co.,127 Fed. Rep. 116, the court dealt with two trade-marks, which later were the subject of litigation before Chancellor Walker in the case hereinbelow mentioned. These two trade-marks were dissimilar enough to make it difficult to express a comparison by word description. Yet the use of resembling elements, such as parallel lines, crossing lines, circles and ovals, was such that the entire ensemble created a general resemblance. An injunction was allowed notwithstanding the fact that wholly dissimilar words were used in connection with the resembling labels or trade-marks. Subsequently, in 1914, these conflicting labels were compared and considered by Chancellor Walker in the case ofNational Biscuit Co. v. Pacific Coast Biscuit Co., 83 N.J. Eq. 369
(at p. 376). He pointed out that when laid side by side the resemblance is not marked but when used as the defendant used it "the similitude is striking, and when thus associated is of a character calculated to mislead and deceive the unwary and unsuspecting purchaser." While the report of that case does not contain an impress of the conflicting trade-marks or labels, I have had the benefit of an inspection of those labels contained *Page 63 
in a volume of its adjudicated cases published by the National Biscuit Company. That inspection, in the light of the result reached by the chancellor in the National Biscuit Co. Case, leaves no possible doubt as to the infringing character of the defendant's trade-mark in the instant case.
I have already suggested that the resemblances, not the differences, should control the question of infringement. That was the view of Judge Kirkpatrick in the federal case ofCauffman v. Schuler, ubi supra. He said:
"It is true that there are differences in labels, such as substitution of the words `Imperial' for `Cauffman's,' the omission of the word `Celebrated,' and other differences, such as the wording of the `caution' and the name subscribed thereto. It is not, however, the dissimilarities which are the test, but the resemblances. As was said by Judge Lacombe in Hansen v.Siegel-Cooper Co. (C.C.), 106 Fed. Rep. 690: `It is possible, but highly improbable, that two persons, neither of whom had ever seen or been informed of the other's design, might have produced packages as similar as the two before the court.' I am unable to account for the numerous resemblances referred to, except as the result of design. There should be but one motive for dressing defendant's goods in a garb so nearly like complainant's, and that was to acquire a part of the trade which the complainant had built up for his goods, and engage in a competition in trade, which the courts of equity hold to be unfair."
In Helmet Co. v. Wm. Wrigley, Jr., Co., 245 Fed. Rep. 824,829, the circuit court of appeals regarded similarity in general appearance as controlling over differences in features. It said:
"While there are different features of these packages, both in words and colors, yet there is a most striking similarity in their general appearance. Complainant's product, it is true, can be distinguished from defendant's products when the packages are examined together for purposes of comparison; this can be done, too, when they are examined separately by one who is familiar with the two sets of packages, since he can do so through the presence or absence alone of Wrigley's name; but the identity is so marked that the average user *Page 64 
desiring the product of either producer would in all likelihood be misled into buying the product of the other."
In connection with the production of "Hudson Seal" there are special and persuasive reasons why the defendant, when selecting a trade-mark, should studiously have avoided resemblance to complainant's trade-mark. I examined the skins received in evidence from the parties. To my eye they were indistinguishable in the color, lustre and feel of the hair side and in the color and general appearance of the reverse or leather side. To distinguish the one product from the other it was necessary for me to look for the trade-mark. In those skins where the name was blurred it required close scrutiny to distinguish between the skins. An attempt by me to make a casual selection of the skins of each party, without giving attention to the name, resulted in confusion, notwithstanding the fact that previously, at the oral argument, I had had presented before me enlarged reproductions of the two trade-marks and had listened to argument on their points of similarity and difference. By this test I demonstrated to myself that one, not introduced to the subject of conflict as I was, could very easily mistake the defendant's trade-mark for that of complainant where the latter he but generally recalled after having seen it in some newspaper, magazine or other form of advertising. Then, again, the respective trade-marks are stamped with the same color (black) ink or other stamping material, on the same color background (light brown), so that the unsuspecting purchaser has not even the opportunity of color differentiation to assist him in giving effect to his recollection. These considerations, together with the fact that the defendant adopted its trade-mark immediately after it was freed from our injunction restraining it from dressing and dyeing "Hudson Seal" prior to July 1st, 1934, together with the fact that the defendant's trade-mark differs geometrically from complainant's only in that straight lines have been substituted for curved lines, lead me to the conviction that the defendant's mark is a studied counterfeit of complainant's mark and was adopted in furtherance of a "palming-off" purpose. The defendant has well brought itself within the language of the case of Williamson Candy *Page 65 Co. v. Ucanco Candy Co., 3 Fed. Rep. 2d 156, 158, where it was said:
"(3) A trader, desiring to deceive, but not versed in the mental sciences, or in the method of implanting in the human mind through association of ideas or by suggestion a desired impression or belief, would probably use only such dress, marks, or names as would present directly to the eye or ear a deceptive resemblance to the dress, mark, or name of the trader, having an established good will. But the trader, not more honest, but more skilled in the means and methods of confusing and deceiving the human mind, would probably resort as well to less direct, but not less successful, ways of accomplishing his aim. By such a person the power through suggestion to awaken the imagination and direct the mind to a predetermined goal would not be overlooked. But the law guards the good will of a trader — and thereby the public — against unlawful injury, and with equal care, whether the method of deception by which the injury is brought about is of the latter or of the former character."
I conclude, therefore, that complainant has clearly established its right to injunctive relief.
This brings me to the question of the accounting for profits. The defense strongly urged that such accounting should be denied for the reason that the bill does not charge the defendant with intentional imitation, nor does it contain any allegation of fraud or of a fraudulent intent. While it is true that fraud is not charged in haec verba, the facts making out a case of fraud are fully presented. For the complainant to have characterized the defendant's conduct, admitted by the stipulation, as fraudulent, would merely have added a conclusion. Vice-Chancellor Emery said, in Eureka Fire Hose Co. v. Eureka RubberManufacturing Co., 69 N.J. Eq. (at p. 167):
"This protection is granted without regard to the intent of the infringer, because a fraudulent intent to deceive the public and appropriate the benefit of the trade reputation of another is conclusively presumed, from the using of the name or mark after request to desist, although the absence of such *Page 66 
intent may in some cases be a defense to an action for damages."
Vice-Chancellor Lane, in the case of Hilton v. Hilton,89 N.J. Eq. 149 (at p. 154), after quoting from the Eureka FireHose Case and citing Wirtz v. Eagle Bottling Co., supra;International Silver Co. v. Rogers, supra, and NationalBiscuit Co. v. Pacific Coast Biscuit Co., supra, said: "Expressed briefly, I think the rule is that `unfair competition' is `fraudulent conduct.'" The Hilton Case was affirmed by the court of errors and appeals in 89 N.J. Eq. 182, with a modification that does not disturb the definition of "unfair competition" given by the vice-chancellor.
Nor do I find any merit in the defendant's contention that the complainant should be denied relief because by its trade-mark it has advertised as "Hollander Seal" or "Seal" what in fact is a dyed muskrat. This contention was advanced for the first time after the case, already closed, had been under advisement for several weeks and the court had notified counsel that the injunction would be awarded. At no time was any testimony introduced or offered to the effect that the public had ever been deceived by the trade name "Hollander Seal." On the contrary, the bill distinctly set forth that the dyed muskrat was commonly
called "Hudson Seal," that it has been produced in this country by that name by various concerns since 1908 and that complainant since it commenced producing that article in 1913 and continuously to February, 1935, stamped immediately underneath its trade-mark the informative words "dyed muskrat" and that since February, 1935, it has added the words "seal dyed muskrat." This, it seems to me, has at all times fully apprized the buying public of the true character of the article subjected to complainant's processes. There is nothing in the pleadings or evidence in this case to warrant the invocation of the "unclean hands" doctrine. The evidence that is before me indicates that in the respect under consideration complainant has dealt openly and fairly with the public to which its products, not directly but ultimately find their way.
It was also insisted for the defendant that profits should not be allowed if the defendant acted in good faith or through *Page 67 
inadvertence or in ignorance of complainant's rights. It is unnecessary for the court to express an opinion as to whether these considerations, if sustained in fact, constitute matter of defense. In the Wirtz Case good faith did not excuse the infringement. Vice-Chancellor Van Fleet held that: "The legal quality of an act, resulting in injury, must be decided not by the motive with which it was done, but by the consequences which have necessarily resulted from it. The law, in civil cases, does not attempt to penetrate the secret motive which induced the act brought in judgment, but judges of its legal quality solely by the consequences which have actually and necessarily proceeded from it. It is no less a dictate of justice, than of sound reason, that every person must be understood to have intended to do just what is the natural consequence of his act deliberately done."
The defendant here will not be heard to advance the claim that he acted in good faith or through inadvertence or in ignorance of complainant's rights. Immediately after it commenced the infringement it received protests from complainant, both orally and in writing, was informed of the details of complainant's claim of infringement and was threatened with an injunction suit. Its promises to discontinue the objectionable use were not kept. Complainant's efforts to secure by peaceful means a discontinuance of the infringement proved futile. Up until the award of the injunctive decree the defendant persisted in the use of the infringing trade-mark and claimed the right to do so. Its conduct was the product of bad faith, not good faith; of purpose and deliberation, not inadvertence, and of an attitude assumed in defiance of complainant's asserted rights, of which it was fully informed, and not in ignorance.
After the court announced that an injunction would go, the defendant suggested laches on the part of complainant. The court is aware of the rule that the party aggrieved by an infringement or by any act of unfair competition should not be permitted to remain silent, stand idly by all the time knowing that the offender is creating profits and then come in, when the profits have accumulated, and demand them as his own. Such conduct should and does bar the right to the *Page 68 
profits, though it does not bar the right to injunctive relief. But, that is not the situation here. The defendant has by its stipulation admitted the substance appearing in paragraph 11 of the bill, from which it appears that in the early part of July, 1934, and again in August the complainant informed the defendant of the claimed infringement and the latter promised discontinuance; that by letter sent in September complainant's objections were fully stated to the defendant and this very suit was threatened; that thereafter there were a number of conferences between the defendant's president and complainant's representative for the purpose of prevailing upon the defendant without suit to discontinue the infringement; that about three months before the bill was filed defendant's president stated that he was considering abandoning the objectionable trade-mark and the adoption of one "which could not possibly offend." As recently as two weeks before the filing of the bill the defendant's president stated that the defendant might voluntarily abandon the protested use. It would seem that these promises and representations were made by the defendant to the complainant to influence the latter to refrain from bringing the threatened suit. Although it later turned out that these promises and assurances were not given in sincerity and were given to string the complainant along, yet the complainant had a right to assume that the defendant might voluntarily discontinue the infringement and thus render unnecessary the effort and expense of an injunction suit. A desire to avoid by peaceful means litigation is to be applauded and encouraged rather than draw the penalty of the loss of a part of the legitimate relief to which the wronged party is by law entitled. I find nothing in complainant's delay of about eight months in bringing suit from which can be spelled out laches. The defendant did not during those eight months alter its position prejudicially as a result of the passage of time. On the contrary, through the entire period it knew of complainant's claim and its purpose to protect it by suit, if persuasion and threat of suit proved unavailing. The defendant chose to stall along, taking with wide open eyes the change that it might have to account for its profits if the threatened suit *Page 69 
were brought and the defendant's conduct were adjudged to be unfair competition.
I am now brought to the measure of the profits to be determined.
Our courts have held that the property right in a trade-mark is of the same quality as a copyright or the right to a patent, and that the remedies available to the owner of any of those rights are, in the absence of statutory regulation, analogous. Our courts have adopted the federal rule stated in BraggManufacturing Co. v. Hartford, 56 Fed. Rep. 292, that:
"`The test of jurisdiction [to decree an accounting] applied in the later cases is whether the bill is filed in season to enable the complainant, under the rules and practice of the court, to move for and obtain an injunction before the expiration of the patent.' If so, although there may be nothing for the injunction to restrain at the time of the hearing [the patent having expired], yet, jurisdiction having existed, to grant an injunction upon the bill filed, the account will be decreed." SeeThe Clark Thread Co. v. William Clark Co., 55 N.J. Eq. 658,668; reversed on measure of profit in 56 N.J. Eq. 789.
In the unfair competition case of L. Martin Co. v. L. Martinand Wilckes Co., 75 N.J. Eq. 257, the court of errors and appeals adopted the rule of the United States supreme court inTilghman v. Proctor, 125 U.S. 136, to the effect that where a court of equity entertains jurisdiction of a suit for infringement of a patent it will not relegate the plaintiff to the law courts for damages "but will itself administer full relief by awarding, as an equivalent or substitute for legal damages, a compensation computed and measured by the same rule that courts of equity apply to the case of a trustee who has wrongfully used the trust property for his own advantage." In this case our court of appeals said that it is better to follow the English rule and that of the United States supreme court and "limit the accounting to the profits made by the defendant."
In all of the cases that I have examined I found that where the injunction issued, whether it was in a trade-mark, trade *Page 70 
name, patent or other kind of unfair competition suit, the profits, when allowed, were all the profits made by the defendant from the sale or marketing of the article or commodity with respect to which infringement occurred. I found no case (other than the Hamilton-Brown Shoe Case below cited) in which the court suggested that the profits might be so apportioned that complainant shall receive only those profits which could be directly attributed to the use of the infringing mark, name or label. I find that in the California case of Graham v. Plate,40 Cal. 593, 599, it was claimed that it was impossible to determine how much of the profit was due to the trade-mark and how much to the intrinsic value of the article. The court said:
"Every consideration of reason, justice and sound policy demands that one who fraudulently uses the trade-mark of another should not be allowed to shield himself from liability for the profit he has made of the use of the trade-mark on the plea that it is impossible to determine how much of the profit is due to the trade-mark and how much to the intrinsic value of the commodity."
I have been much helped and guided by the opinion of Mr. Justice Pitney, speaking for the United States supreme court in the case of Hamilton-Brown Shoe Co. v. Wolf Brothers Co.,240 U.S. 251; 36 Sup. Ct. Rep. 269. There it was insisted by the defendant that the profits recoverable by the successful complainant should be limited "to such amount as may be shown by direct and positive evidence to be the increment of defendant's income by reason of the infringement, and that the burden of proof is upon complainant to show what part of defendant's profits were attributable to the use of the infringing mark." The supreme court held that the complainant was not required to make such apportionment where it cannot be made and that to accede to the defendant's contention would result in a denial of all compensation to the complainant. The court quoted from Graham
v. Plate the following:
"In sales made under a simulated trade-mark it is impossible to decide how much of the profit resulted from the intrinsic value of the commodity in the market, and how *Page 71 
much from the credit given to it by the trade-mark. In the very nature of the case it would be impossible to ascertain to what extent he could have effected sales and at what prices except for the use of the trade-mark. No one will deny that on every principle of reason and justice the owner of the trade-mark is entitled to so much of the profit as resulted from the use of the trade-mark. The difficulty lies in ascertaining what proportion of the profit is due to the trade-mark, and what to the intrinsic value of the commodity; and as this cannot be ascertained with any reasonable certainty, it is more consonant with reason and justice that the owner of the trade-mark should have the whole profit than that he should be deprived of any part of it by the fraudulent act of the defendant. It is the same principle which is applicable to a confusion of goods. If one wrongfully mixes his own goods with those of another, so that they cannot be distinguished and separated, he shall lose the whole, for the reason that the fault is his; and it is but just that he should suffer the loss rather than an innocent party, who in no degree contributed to the wrong."
In Dickinson v. O. W. Thum Co., 8 Fed. Rep. 2d 570,573, the defendant insisted that the burden rested upon the plaintiff to prove what profits were attributable in whole or in part to an infringing trade-mark and that the evidence there did not support a finding that any profits were so attributable. The court pointed out that the defendant had been adjudged to be a willful infringer of a valid trade-mark and said that in that situation he cannot urge successfully that his sales were due to the merit of his product or that it could not be ascertained how much of the sales was due to merit and how much to the infringement. The court further said:
"(5) Under the facts found and proved, the rule ofHamilton-Brown Shoe Co. v. Wolf Brothers Co., 240 U.S. 251;36 S.Ct. 269; 60 L.Ed. 629, is applicable. The infringer must account for the entire profits derived from the sale of the infringing goods. The recovery will not be limited to such amount as can be shown by direct and positive evidence to have resulted from the use of the infringing mark. The burden is not cast upon the plaintiff to attempt the impossible *Page 72 
task of showing what part of defendant's profits are attributable to the use of the infringing mark and what part to the intrinsic merit of his goods or other causes. Whatever conflict in the previous decisions might be found was put at rest by that decision."
I have therefore come to the conclusion that the defendant should reveal the number of skins dressed and dyed by it since July 1st, 1934, upon which it stamped or impressed the trade-mark here held to be an infringement and to account for all the profits made by it from such work. If it can definitely be determined how much of those profits are attributable to the use of the infringing trade-mark itself, then complainant shall have no more. If, however, that cannot be determined then complainant is entitled to all of the profits and the defendant will be decreed to make payment thereof.
There will be a decree in accordance with these conclusions and a reference to a master to take the account.
 ADDENDUM.
Since writing the foregoing opinion my attention has been called to the fact that an appeal has been taken from the decree advised by me in this matter and that the counsel fee of $750 allowed by me to complainant is challenged as excessive. Before the allowance was made counsel filed with me a statement of the time spent and the services rendered in the cause. Aside from this, I of course know, from sitting in the case, what counsels' labors were. Although no oral proofs were taken at the final hearing there were several arguments at different times concerning the question of the defendant's accountability for profits. Briefs and reply briefs were filed by complainant's solicitors and they exhibit considerable labor in the gathering of authorities, and were of aid to the court. Considering the time which counsel necessarily must have spent in the preparation of the bill of complaint, exhibits, briefs and in several appearance before the court, I was satisfied that the claim which the solicitors made that about eight full days were spent in the litigation is correct. Considering *Page 73 
the standing of counsel and the character of the work performed, I regarded an allowance of $750 as altogether reasonable.