13 N.J. Super. 416 (1951)
80 A.2d 575
AMERICAN SHOPS, INC., PLAINTIFF-RESPONDENT,
v.
AMERICAN FASHION SHOPS OF JOURNAL SQUARE, INC., DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued April 23, 1951.
Decided May 8, 1951.
*419 Before Judges McGEEHAN, JAYNE and WM. J. BRENNAN, JR.
*420 Mr. Isadore Glauberman argued the cause for appellant.
Mr. Thomas J. Brogan argued the cause for respondent (Mr. Louis Dworetz, attorney).
The opinion of the court was delivered by JAYNE, J.A.D.
A lecturer on the subject which is identified in the law as "Unfair Competition" once asked a student for his conception of the subject. The student replied: "Well, it seems to me that the courts try to stop people from playing dirty tricks." It is difficult to discover in the many adjudications a definition more satisfactory. The theme is said to exemplify the embodiment in the law of the ancient rule of the playground  "Play fair." There is the expression: "The law will not permit the trespasser to take the crop away from the sower."
More specifically, Lord Chancellor Halsbury remarked: "Nobody has any right to represent his goods as the goods of somebody else." The English nicknames, "passing off" or its equivalent "palming off," although expressive of the rationale of the early cases, are no more definitive today than our name "unfair competition." The American Law Institute has preferred to employ the appellation "unfair trade practices." However, it becomes apparent that there is no fetish in the word "competition." The invocation of equitable relief rests vitally upon the element of unfairness. It is at once acknowledged that a detriment to one's business which is wholly incidental to fair and lawful competition is damnum absque injuria.
Relatively few cases implicating acts which would now be considered as actionable under the rules of unfair competition were decided in England or in America prior to 1850. Since then, due partly to the flexibility of equitable relief and partly to the changes in business methods and standards of commercial morality, the scope of this field of litigation has constantly expanded.
*421 No catalogue exists of all acts which constitute unfair competition. No prophet has undertaken to foretell what acts will be held to constitute unfair competition in the future, because equity broadly concerns itself with the suppression of injurious deception and fraud whatever the means by which they are wrongfully accomplished. It must be realized that injunctive relief is not confined to the protection of those having trade-marks and trade-names. It reaches beyond to encompass all cases in which it is evident that fraud and deception are practiced by one in disparaging or capturing the trade of a competitor. The ingenuity of the unfair competitor thus eludes classification but not always the restraint of a court of equity.
Gradually the list of adjudicated unfair acts grows; gradually the legal concept of fairness becomes more elastic, for as Lord Holt forewarned, "if men will multiply injuries, actions must be multiplied too. * * *"
Assuredly the most common form of unfair competition is the imitation of a trade-name, trade symbol or device by a competitor. It is emphasized by counsel for the appellant that this is not a trade-mark case. An examination of the decisional law in its development during the past half-century discloses that trade-mark infringement and unfair competition have been almost amalgamated. The similarity between them in many instances is obvious. In both, the defendant is likely passing off his goods as the plaintiff's goods by the use of a symbol. Deceit may be noticed to drip out of both kinds of imitation. And so, Mr. Justice Pitney in Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 412 (1916) stated: "This essential element is the same in trademark cases as in cases of unfair competition unaccompanied with trademark infringement. In fact, the common law of trademarks is but a part of the broader law of unfair competition."
True, the struggles of some judges and lawyers to magnify a distinction between technical trade-marks and devices which were protected for their secondary meaning are discernible in the reported cases, but it is also observable that for the most *422 part the difference has made no difference. Whatever the tort was named, the judicial protection afforded against it was substantially the same.
It is so, that the distinction between descriptive and non-descriptive words is recognized. The criterion of whether a given brand is a trade-mark or trade-name is after all etymological. A trade-mark must be fanciful, arbitrary, unique, distinctive, non-descriptive, whereas words descriptive of qualities or attributes, generic designations, personal, partnership, and corporate names, geographical terms, and the like are trade-names. Trade-marks are protected in a suit for infringement, trade-names in an action to restrain "passing off," "palming off," or other more modern forms of unfair competition. Although the decisions are not unanimous, it may now be confidently stated that the trade-name cases tend so closely to approximate the trade-mark cases that the supposedly sharp line of demarcation is being substantially extinguished except with regard to the scope of the protection accorded. In a non-technical sense the trade-name is the trade-mark augmented by secondary meaning.
The issue of free competition is sometimes raised where the protection of fair competition requires restrictions on someone's use of a word in an unusual sense which is not literally descriptive. The use of such words may nevertheless in proper circumstances be protected from a deceitful use in competitive trades. For example, Ivory soap is not made of ivory. There is no gold in Gold Dust washing powder, or in Gold Medal flour. Old Crow whiskey is not distilled from old crows. There is no bull in Bull Durham tobacco. White Rock is in fact water.
It is now the established law that such a word or associated words may by usage and popular acceptance acquire a secondary, special or, shall we say, trade meaning, as indicative of the identification of the goods, business, or services of the user and therefore entitle such person or corporation to protection against an unfair and deceptive usage by another. 1 Nims, Unfair Competition and Trade-marks, ch. IV, p. *423 152; 52 Am. Jur., Trade-Marks, Trade Names, &c., 554, sec. 72.
So also where a geographical name has become the generic designation of a business or product, the courts have been alert to recognize the circumstances of the particular case and have not hesitated to grant often times precisely the same relief that would be conferred in trade-mark cases. American Waltham Watch Co. v. United States Watch Co., 173 Mass. 85, 53 N.E. 141 (Sup. Jud. Ct. 1899), is in this respect instructive. Cf. Polackoff v. Sunkin, 115 N.J. Eq. 134 (E. & A. 1934), anent the use of the trade-names "New Jersey Malt Supply" and "New Jersey Malt Products Co." See, too, American Automobile Association v. Automobile Association of New Jersey, 142 N.J. Eq. 673 (E. & A. 1948). The word "American" was also implicated in the following decisions: American Clay Mfg. Co. v. American Clay Mfg. Co. of N.J., 47 A. 936 (Sup. Ct. Pa. 1901); Hamilton Shoe Co. v. Wolf Brothers, 240 U.S. 251 (1916)  "American Girl"; American Radio Stores, Inc., v. American Radio & Television Stores Corporation, 150 A. 180 (Del. Ch. 1930); R.W. Eldridge Co., Inc., v. Southern Handkerchief Mfg. Co., 23 Fed. Supp. 179 (U.S.D.C.T. 1938)  "All American"; American Oil Co. v. Norkus, 57 A.2d 868 (Sup. Ct. Pa. 1948).
In cases in which the usage of descriptive words ordinarily freely afloat in the public domain is alleged to incite unfair competition, the inquiry envelops the question whether the plaintiff's commercial employment of the words in the territory of his business has also infused them with a so-called secondary meaning.
Certainly, the words of our language are normally public property. The control of equity over words arises from the use which is made of them. They may be lifted from the public domain when their use has come to denote to the purchasing public the particular manufacturer or vendor.
Although universality of recognition of such an artificial trade-name is not required, its protection is largely governed *424 by the area of its popularity which may be the selling zone or the advertisement or reputation zone.
Good-will is an intangible value. As an economic phenomenon it more or less fixes the competitive position of a business in the market; as a matter of accounting and appraisal it is an element of the valuation of a business; legally it represents a pecuniary interest recognized as a property right and, as such, entitled to protection. We wonder if it is not reasonable to state that while a business may attain various types of good-will depending upon the divergent spheres within which its reputation is established, its good-will after all inheres in how favorable the business is regarded by others. And so the intangible good-will has its origin and its existence largely in the visible symbols such as trade-marks, trade-names, and distinctive advertising, which constitute the attractive agency which brings in custom. Good-will, however, has no independent existence. It is necessarily attached to a business. What business?
Perhaps there never was a time when good-will, so called in the language of the market place, has played a more important part in the theatre of commerce than it plays today. There never was a time when the means of advertising designed to create a good will were so various and highly developed as today. There probably never was a time when there were so many temptations to motivate the trade pirate to endeavor to purloin the good-will of others for his own profit.
At the root of it all is the fact that the law emancipates and, indeed, encourages fair, open, and honest competition. It endeavors to suppress and eradicate evil practices. Among such it interdicts a merchant from taking a fraudulent advantage of his competitors and of the purchasing public by dealing under false colors and thereby vending his own goods for those of his rivals. "That is not fair competition; it is closer akin to piracy," said Justice Knapp in Miller Tobacco Manufactory v. Commerce, 45 N.J.L. 18, 24 (Sup. Ct. 1883).
*425 Our attention has been invited by the briefs in the present appeal to numerous decisions of the federal courts. It will be recalled that since the decision of the Supreme Court in Erie v. Tompkins, 304 U.S. 64, in 1937, in which it was held that in cases which do not arise and implicate the Federal Constitution or federal statutory law, the federal courts must follow the local law, the responsibility for the development of the fundamental principles applicable to unfair competition has been largely delegated to the state courts. The discussion will accordingly be resumed on our home grounds.
No one, we think, now doubts the power of a court of equity to restrain the deceptive and fraudulent use of a trade-name. Indeed, our former Court of Chancery has declared that where one knowingly adopts an existing trade-name which is actually misleading, the intention to mislead, in the absence of explanation, will be presumed. Eureka Fire Hose Co. v. Eureka Rubber Manufacturing Co., 69 N.J. Eq. 159 (Ch. 1905), affirmed 71 N.J. Eq. 300 (E. & A. 1906).
Vice-Chancellor Lane said, "Expressed briefly, I think the rule is that `unfair competition' is `fraudulent conduct.'" Hilton v. Hilton, 89 N.J. Eq. 149, 154 (Ch. 1917), modified Id. 182 (E. & A. 1918).
However, the injunctive relief does not necessarily depend upon proof that one who uses a trade-name or slogan which interferes with another's prior use of it, did so with a premeditated intent to injure his competitor or to deceive the public. The consequences of his act predominate over the quality of his motive in the determination of the court. Polackoff v. Sunkin, supra.
Our reports are alive with decisions relative to actions for alleged unfair competition. The following are representative: Wirtz v. Eagle Bottling Co., 50 N.J. Eq. 164 (Ch. 1892); International Silver Co. v. William H. Rogers Corp., 67 N.J. Eq. 646 (E. & A. 1905); Eureka Fire Hose Co. v. Eureka Rubber Mfg. Co., supra; Busch v. Gross, 71 N.J. Eq. 508 (Ch. 1906); O'Grady v. McDonald, 72 N.J. Eq. 805 (Ch. 1907); Rubber, &c., Co. v. Rubber-Bound Brush Co., 81 N. *426 J. Eq. 419 (Ch. 1912), affirmed, 81 N.J. Eq. 519 (E. & A. 1913); Cape May Yacht Club v. Cape May Yacht and Country Club, 81 N.J. Eq. 454 (Ch. 1913); National Biscuit Co. v. Pacific Coast Biscuit Co., 83 N.J. Eq. 369 (Ch. 1914); Robert H. Ingersoll & Brother v. Hahne & Co., 89 N.J. Eq. 332 (Ch. 1918); Hilton v. Hilton, 90 N.J. Eq. 564 (E. & A. 1919); Bayuk Cigars, Inc., v. Fine, 112 N.J. Eq. 166 (Ch. 1933), affirmed, 114 N.J. Eq. 83 (E. & A. 1933); A. Hollander, &c., Inc., v. Philip A. Singer, &c., Inc., 119 N.J. Eq. 52 (Ch. 1935), affirmed, 120 N.J. Eq. 76 (E. & A. 1936); J.B. Liebman & Co., Inc., v. Leibman, 135 N.J. Eq. 288 (Ch. 1944); Weiss v. The Stork & Gift Shop, 137 N.J. Eq. 475 (Ch. 1946); Goldscheider v. Schnitzer, 3 N.J. Super. 425 (Ch. 1949).
We borrow from them a few apt quotations: "The jurisdiction of courts of equity to prevent injury from infringement of trade-names has been liberally exercised and applied in all circumstances whenever it appeared that the name was an established, distinctive and valuable adjunct to an undertaking, whether used to distinguish manufactured articles, a place of business, or a corporation, commercial, or one formed not for pecuniary gain. All that is required to bring into activity the injunctive powers of the court, is to inform it that the complainant's trade is in danger of harm from the use of its name, by the defendant, in such a way, as is calculated to deceive the public into the belief that the defendant's affairs, in the respect complained of, are those of the complainant." Cape May Yacht Club v. Cape May Yacht and Country Club, supra.
From Weiss v. The Stork & Gift Shop, supra, we appropriate: "Rival merchants have no right, by imitative devices, to mislead prospective purchasers into buying their merchandise under the impression that they are buying that of their competitors, and the use of such devices or means may be enjoined. The law guards the trade name and good-will of a merchant, and thereby the public, against unlawful injury. * * *
*427 "One may not lawfully use a trade name as near the established name of another as to lead customers and the public to suppose that the establishment of the user is the establishment of the other or that the product sold is the product of the other."
It is upon the aforementioned substructure that we proceed to construct our determination of the present appeal. Our examination of the evidence, however, is pursued with due regard "to the opportunity of the trial court to judge of the credibility of the witnesses." Rules 1:2-20; 4:2-6.
The learned and experienced trial judge submitted two concordant memoranda of his conclusions. In the first he expressed in general his findings of fact: "The evidence in this case discloses that the plaintiff, American Shops, Inc., incorporated in 1932 and since that time has engaged in the sale at retail of men's clothing and accessories. Its sole store is now and has been, during the period from 1932, located at 800 Broad Street, Newark. At this location, a large sign was erected, which prominently displayed the words `American' in sizeable letters and the word `Shops' in smaller letters.
"During the past ten years, plaintiff has advertised extensively in newspapers circulating in northern New Jersey, including Newark and Jersey City, and throughout Hudson and Bergen County communities. Likewise, it engaged in advertising by radio and television throughout the same area and in metropolitan New York.
"In all the advertising media, plaintiff stressed the name American Shops and the theme that stars of radio, moving pictures, the theatre and particularly of the sports world, wore and admired its type suits and clothes. Over the ten-year period referred to, in excess of $300,000 was expended on such advertising.
"As an incident of the emphasis on stars of stage, screen, radio and sports, and their interest in the clothes of American Shops, at times, down at least through 1948, in the advertisements, the `i' in `American' was dotted with a star, and stars dotted the advertisements themselves. In one copy used in *428 1947-1948, not only do stars appear but near the bottom of the advertisement a moving picture camera and a cameraman appear.
"Plaintiff's store featured a rather distinctive, open-type front, with large glass windows and some palm trees that seemed to come from the base of the windows and extend at an angle toward the ceiling of the entranceway.
"The testimony indicates also that plaintiff had developed a mailing list of some 47,000 customers, and the estimate was given by its president that 8,000 of these customers were from Hudson County. The entire list was made up of persons who had made purchases at the store during the last seven years. How many times each person had purchased was not given.
"In 1944, plaintiff had in its employ one Murray Siegel as a salesman. His relations with plaintiff were severed in May 1944. On November 30, 1944, Siegel and Samuel Leyner filed a trade name certificate in the Hudson County Clerk's Office, indicating that they intended to conduct the business of men's and boys' clothing at 339 Jackson Avenue, Jersey City, under the name American Fashion Shops.
"Prior to this time, Leyner had been operating the same type business in Jersey City under the name Fashion Outfitters.
"The Jackson Avenue shop began operation at the end of 1944, and has operated there ever since.
"On December 22, 1949, Siegel, Leyner and two others organized the defendant corporation under the name `American Fashion Shops of Journal Square, Inc.' and set forth that its purpose was to engage in the retail sale of men's and boys' clothing and accessories. Leyner became its President and Siegel, Vice-President.
"On March 8, 1950, the defendant corporation opened a store for such retail business at 2847 Hudson Boulevard, Jersey City, at Journal Square, which the testimony shows is one of the busiest sections of Jersey and which describes it as the `hub of Hudson County.' The opening of the store was preceded by a full-page advertisement in the Jersey Journal, *429 which reported the `Grand Hollywood opening' of `American' in large script type, with a star over the `i' in `American.' Underneath this, in smaller block type appeared `Fashion Shops of Journal Square.' Although this is part of the corporate title, which ends with `Inc.', no `Inc.' appeared in the advertisement to indicate that the reference was to the corporate title as distinguished from mere advertising matter.
"The advertisement further featured stars and invited the public to meet movie figures, models and sport celebrities at the opening. And it showed a moving picture camera and cameraman in the foreground. After this opening night, the defendant asserted that it never again advertised personal appearance of celebrities at its store. * * *
"Prior to the opening of the Journal Square store, defendant caused to be constructed a sign over and running the full width of the store, on which the word `American' with a star over the `i' occupied all but a small portion of the space. About on the same line as `American' but in smaller block type appeared the word `Shops.' Above `Shops,' running obliquely from left to right as one faces the sign, the word `Fashion' is set out, also in much smaller block letters and with three stars alongside it.

* * * * * * * *
"Plaintiff seeks an injunction restraining the defendant from using the words `American Shops, Inc.' as part of its title in its advertising or dealings with the public. It alleges that such use constitutes unfair and unlawful competition and an unlawful infringement upon its corporate name.
"In support of its claim for injunction, it has produced evidence from some of its Hudson County customers that the arrangement of defendant's store sign, in conjunction with the design of the store, the type clothes carried, the `decor' of the store as some of them put it, pictures of some celebrities in the store, and the tree or plants there, led them to believe that the defendant's store was a branch of plaintiff's store in Newark. Some witnesses merely noticed `American' over the store and some, `American Shops.' Others bought articles *430 thinking they were dealing with plaintiff in a branch store. One person bought a coat in plaintiff's store in Newark. Later, being in Jersey City when it was necessary to have a button replaced, he saw defendant's sign and store, and believing the store to be a branch of the plaintiff company, he went in to see if the repair could be made there. Although he advised defendant's sales-person of the fact of the purchase at the Newark store, no clarifying advice was offered. Instead, he was told that a set of buttons would be ordered for him. Another witness remarked to a salesman of defendant in the store that it was nice having a branch in Jersey City so the people did not have to go to Newark. To this the salesman made no reply.
"Proof was also adduced to indicate that the confusion which plaintiff claims would and does take place in the mind of an ordinary member of the public because of the defendant's conduct, exists in the trade itself. It appeared that a men's costume jewelry manufacturer, with which both plaintiff and defendant do business, in filling plaintiff's order, sent cuff links and tie clasps in jewelry boxes on one occasion, which had stamped inside `American Fashion Shops of Journal Square,' and on another occasion, `American Fashion Shops of Newark.'
"The evidence showed further that Newton Steinberg, another former employee of plaintiff, opened a similar shop in Bayonne under the name `American Hollywood Shop.' This man, who now has resumed employment with plaintiff, asserted that after he opened the shop, Siegel and Leyner protested against his use of the name. This occurred before the opening of the Journal Square store. Steinberg and his partner visited the Jackson Avenue place and discussed the matter with them. On this occasion, Siegel asked why they were using his firm name and Steinberg's partner replied in effect that Siegel and Leyner were using a name similar to the plaintiff's and if they could `get away with it,' why couldn't his shop.

* * * * * * * *
*431 "The conclusion is inescapable that the format of the sign resulted from a desire to emphasize `American' and `Shops.' This conclusion is strengthened when it is recalled that the script writing of `American' with the star dotting the `i' was used by the plaintiff in its advertising in 1948 and prior thereto.

* * * * * * * *
"From my own examination of the pictures of defendant's sign, I am satisfied that an ordinary buyer of plaintiff's goods might well be deceived into believing that defendant's store was connected with the plaintiff.

* * * * * * * *
"Further, I am convinced that when the defendant decided to open, and did open, its Journal Square store, it embarked upon a course of wilful deception, the most glaring example of which was the store sign. By this sign, the preliminary advertising campaign and its disingenuousness in dealing with inquisitive customers and by other means, it sought to make the public beieve that its store was a part of, or a branch of, the plaintiff's Newark store. Plainly, the purpose was to take, what some of the literature in the field of unfair competition and trade regulation calls, a `free ride' on plaintiff's newspaper, radio and television advertising program.
"These conclusions warrant injunctive relief."
We concur that there was abundant evidence with its productive inferences to justify those conclusions of fact.
The masquerade so cunningly contrived by the defendant clearly called for equitable intervention. Indeed, our statute, R.S. 14:2-3, ordains that "The (corporate) name shall not be one already in use by another existing corporation of this state, or so similar thereto as to lead to uncertainty or confusion." Glucose Sugar Refining Co. v. American Glucose Sugar Refining Co., 56 A. 861 (Ch. 1899); Edison Storage Battery Co. v. Edison Automobile Co., 67 N.J. Eq. 44 (Ch. 1904); Eureka Fire Hose Co. v. Eureka Rubber Mfg. Co., supra.
*432 The suggestion of laches as a bar to injunctive relief against the proposed continuance of acts of unfair competition in the future is untenable in a case of this nature. Blue Goose Auto, &c., v. Blue Goose Super, &c., 110 N.J. Eq. 547 (E. & A. 1932); A. Hollander & Sons, Inc., v. Jos. Hollander, Inc., 117 N.J. Eq. 306 (Ch. 1934), modified 118 N.J. Eq. 262 (E. & A. 1935).
Nor has the plaintiff in the present action indulged in laches which disentitles it to an accounting for profits resulting from the deception. Although an account of profits will not ordinarily be taken where the wrongful use of the trade-name has been merely accidental, or without any actual wrongful intent to defraud a plaintiff or deceive the public, yet in no just sense can this defendant be said to have acted innocently or in ignorance of the plaintiff's rights.
The mandatory provision in the judgment relative to the removal of the store sign is modified to conform more literally with the conclusions of the trial judge to read: "the defendant shall remove from its store sign the word `American' now in use," and so forth.
In all other respects the judgment is affirmed.