285 N.J. Super. 274 (1995)
666 A.2d 1028
PLATINUM MANAGEMENT, INC., D/B/A EMBRACE, PLAINTIFF,
v.
BRIAN DAHMS, MORTON M. ROSENBERG, GREAT AMERICAN FUN CORP., AND JOHN DOES # 1-5, DEFENDANTS.
Superior Court of New Jersey, Law Division, Bergen County.
Decided April 11, 1995.
*282 Gladys W. Orr, for plaintiff (Bressler, Amery & Ross, attorneys).
Eric L. Brown of the Ohio Bar (Eric L. Brown Co., attorneys) and Richard E. Kummer (Kummer, Knox & Naughton, attorneys), for defendants.
KOLE, J.A.D., Retired and Temporarily Assigned on Recall.

[This is an abridged version of the opinion on file]
Platinum Management, Inc., d/b/a Embrace (PMI, Embrace or plaintiff), sued defendants Brian Dahms (Dahms), Great American Fun Corporation (GAF or GAF Ohio), and Morton M. Rosenberg (Rosenberg) for damages. The claims by PMI presently in issue are as follows:
1. Dahms breached his employment agreement with PMI, through soliciting PMI's customers and misappropriating PMI's confidential information after accepting employment with GAF.
2. Dahms failed to discharge his duty of loyalty to PMI, as an employee and an officer, in that he neglected his duties to PMI in the critical weeks before his resignation, which was timed on the eve of the most important sales event of PMI's year, the 1992 Hong Kong Toy Fair.
3. Dahms and GAF misused Dahms' inside knowledge and misappropriated PMI's confidential information, including its sales strategy, customer identities, and pricing policy to unfairly compete with PMI.
4. Dahms and GAF tortiously interfered with PMI's prospective economic advantage through the misuse of PMI's confidential information and the use of false and misleading statements about *283 PMI's financial condition and ability to ship its products, to divert business from PMI's customers.
5. Rosenberg breached his duty of employee loyalty to PMI by inducing Dahms to accept employment with GAF prior to Rosenberg's own resignation from PMI, and by divulging confidential information entrusted to him by PMI to GAF.
6. GAF and Rosenberg tortiously interfered with Dahms' employment relationship with PMI by inducing Dahms to leave PMI without divulging Rosenberg's own association with GAF.
Dahms has counterclaimed against PMI for a bonus allegedly due him as computed under the employment agreement. It is PMI's contention that Dahms has forfeited any claim to this payment, as he has both breached the agreement upon which it is based and repudiated it.
Defendants have asserted a number of defenses which will be discussed during the course of this opinion.
Based on the credible evidence and reasonable inferences therefrom, I make the findings that follow.
PMI, with the trade name of Embrace, is a manufacturer, designer and seller of plush toys. Plush toys are three dimensional soft and squeezy products, which are cut, stuffed and sewn with or without accessories or with or without devices for music or sound. PMI's line includes musical toys which operate by way of an electronic pressure sensitive chip battery. PMI began its business through the introduction, in 1987, of its bear bag product. This became a very popular new product.
Jerry Auerbach (Auerbach) is the President of PMI and has been affiliated with it since he and his wife, Linda Auerbach, started the business out of their home in June 1986.
In its early years, the business of PMI focused on mass market direct import business. This business concentrated on selling to very large retailers on a letter of credit basis. In order to get the best and competitive price, these customers would take delivery in *284 the Orient and assume the financial responsibility of bringing the merchandise over by ocean freight.
In 1991, PMI had almost 50 active mass market letter of credit customers. Most of PMI's customers have been purchasing from it for several years, in many cases since it began in 1986. Once a customer relationship is established, it is likely to continue for many years, provided, of course, the products sold by PMI are deemed to be saleable by the customer.
PMI utilizes both direct sales agents and independent sales agents to sell its products. It makes sales presentations to its customers by a telephone appointment or by arranging to meet with the customer at a trade show. The most important trade show is the Hong Kong Toy Fair, held in Hong Kong each January. On average, approximately fifty-five percent of PMI's annual sales revenue is derived from its presentations at the Hong Kong Toy Fair. An additional twenty to twenty-five percent is derived from presentations at the New York Toy Fair, held in February each year.
Dahms contacted PMI regarding a sales position after he had been dismissed from his prior employment at Spencer Gift.
In early 1988, Dahms was employed by PMI in the capacity of Vice President of Sales. He was the first full-time sales person hired by PMI. PMI considered this a significant move in the company's growth.
When Dahms joined PMI, he had no direct experience selling toys to retailers. From the beginning of his association with PMI, he was given a broader scope of responsibility for the running of PMI than any other employee. He was a key person, privy to the innermost secrets of the company.
For the first year of his employment with PMI as Vice President of Sales, Dahms lived in the Auerbachs' home. Auerbach undertook to train Dahms so that he could make effective sales presentations. Auerbach also introduced Dahms to PMI's customers and familiarized him with their buying habits and personal *285 attributes. This customer information was considered by PMI to be confidential.
Dahms was advised by PMI of the need to keep all of the foregoing information in confidence.
When Dahms joined PMI, he executed an employment agreement (the Agreement), which included an unusual non-competition covenant to meet Dahms' suggested changes in the original draft. It provided that, during its term and, for one year after its termination for reasons other than its mere expiration, Dahms would not solicit or accept business from any PMI customers for anyone other than PMI; or disclose the names of any such customers to any other person. The Agreement commenced on April 18, 1988 and was to continue for three years. It would automatically be renewed for additional one-year periods unless either party elected not to renew by notifying the other in writing thereof at least sixty days prior to commencement of a renewal period. A resignation would trigger the applicability of the non-competition provision. The Agreement also required Dahms to devote his entire business time and attention to PMI's business and to serve PMI faithfully.
In September 1989, Auerbach and Dahms agreed to a written amendment to the Agreement by providing for the computation of a sales override bonus for Dahms on certain PMI sales. Dahms did not receive his 1991 override bonus.
On March 13, 1991, Auerbach received a memorandum dated March 1, 1991, from Dahms which stated:
Per section 9 of ... the [Agreement], I am notifying you that I do not wish to renew this specific agreement for an additional one-year period. However, ... do not interpret that this means I am self-terminating our employer-employee relationship on April 18, 1991.
I think we would both feel much better with an agreement, effective April 18, 1991, that just details compensation for the upcoming year and is renewable by both parties each year.... I will submit my proposal to you on or about April 1, 1991 for your review. Hopefully, we can agree on something by April 18, 1991.
Auerbach understood this memorandum to mean that Dahms wanted more money. In the past, Dahms and Auerbach resolved *286 questions concerning Dahms' compensation under the Agreement when they met in Hong Kong in January.
Immediately after receiving the memorandum, Auerbach had a telephone call from Dahms in which Dahms indicated that he wanted to continue his employment under a new package and asked Auerbach not to consider the memorandum as a resignation.
The Agreement does not provide for its termination unless Dahms' employment were also to be terminated. Auerbach reasonably did not understand the memorandum to be either a termination of Dahms' employment or of the Agreement.
The Agreement requires sixty days' advance notice of nonrenewal before April 18, 1991  the commencement of its renewal date. Dahms did not send the March 1 memorandum to Auerbach sixty days in advance of such renewal date.
After sending the notice purporting to terminate the Agreement, in memoranda to Auerbach Dahms nevertheless continued to rely on it for the payment of his override bonus.
Dahms contended that he later resigned by reason, among others, of the fact that the 1991 line of PMI was "weak" and bear bags were "tired." Notwithstanding this assertion, soon after he resigned from PMI, Dahms presented GAF's bear bags to the customers he saw at the 1992 Hong Kong Toy Fair.
By late 1991, Dahms had principal responsibility for overseeing the mass market division or trade at PMI. Part of his duties involved prodding PMI's sales representatives to make appointments with the buyers for the Toy Fair.
Prior to January 1992, Dahms attended the Hong Kong Toy Fair with Auerbach. Auerbach relied upon Dahms to make the appointments for the Fair and to handle the necessary paperwork to prepare quotes for the buyers. Dahms frequently also would make the presentations to the buyers on behalf of PMI.
In mid-1990, PMI employed defendant Rosenberg as Vice President of Marketing. His contract contained no covenant not to *287 compete. Among other things, Rosenberg had responsibility to make Toy Fair appointments for a group of customers.
I find that Rosenberg was treated shabbily by PMI while he was employed there. He properly felt that PMI was not using his talents, did not appreciate his efforts for the company, and had treated him unfairly when it fired him in April 1991, (after a leg injury) and then rehired him part time at a substantially reduced salary.
Defendant GAF, an importer and wholesaler of toys, was founded by H. Brian Haney (Haney) in October, 1981. Haney remains the sole owner and president of GAF Corp. He is also the sole owner of Great American Fun Hong Kong Limited (GAF Hong Kong) an exporter of toys located in Hong Kong.
There is a history of a bad relationship between PMI and GAF. Sometime in 1988, PMI entered into an exclusive distribution agreement with GAF granting exclusive distribution rights for PMI's designs for domestic sales, with some exclusions. Under the agreement, PMI manufactured products which were sold by GAF. When the exclusive distribution agreement was entered into, the primary focus of GAF had been mechanical battery-operated toys. GAF had few plush toys and did not sell bear bags.
In the spring of 1989, Auerbach discovered that GAF was using an Indonesian factory to manufacture bear bags designed and copyrighted by PMI without PMI's authorization. PMI brought a federal court action against GAF. It was settled in April 1991 pursuant to a written agreement. Under the settlement, GAF continued to sell its own bear bags but agreed to change the design thereof.
Haney appears to have had actual animosity toward PMI and Auerbach. This may have stemmed from the federal litigation or may have been the result of personal dislike or of competitiveness.
In June or July 1991, Haney raised the possibility of hiring Dahms to work at GAF in order to assist in creating an increase *288 in the direct import business of GAF. Haney viewed Dahms as having significant knowledge of customers with whom GAF had no previous substantial involvement and, thus, as able to add to GAF's business.
It should be noted that until 1991, GAF's growth in the development of mass market accounts, comprising a significant portion of PMI's business, in Haney's words, had been "stifled." Its business basically related to gift accounts, since the person in charge of sales, was of the view that selling to discounters or mass market type of accounts would have a serious deleterious effect on GAF's other business.
Before submitting their resignations to PMI in December 1991, Dahms and Rosenberg attended meetings at GAF in Ohio which, I find, included discussions of PMI accounts that Dahms and Rosenberg might be able to bring in to GAF for the purpose of increasing its business, particularly its mass market letter of credit operation. In October, November and December 1991, Haney aggressively pursued Rosenberg and Dahms and finally, in December, they were employed by GAF pursuant to written agreements. Rosenberg assisted in inducing Dahms to be employed by GAF.
Rosenberg was hired by GAF pursuant to a letter from GAF dated December 2, 1991. Dahms was hired on December 5, 1991. Neither had informed PMI of his intention to resign prior to any of their meetings with GAF or his employment by GAF.
GAF requires virtually all its employees to sign very restrictive confidentiality and noncompetition agreements. Despite Haney's testimony to the contrary, I find that he did not ask Dahms during any interview whether he had such an agreement with PMI. In view of GAF's own employee restrictive covenants practice, the failure to ask can reasonably be interpreted as intentional or at least a form of recklessness  namely, a desire to hire Dahms, irrespective of any such agreement with PMI. It was a form of willful blindness. Haney and GAF are chargeable with knowledge of the existence of Dahms' restrictive covenant with PMI and that *289 he was violating it when he disclosed PMI customer information to GAF and sold to such customers for GAF.[1]
On or around December 12, 1991, Dahms called Ronald Banafato (Banafato), a sales agent at PMI, and advised him that he was terminating his employment with PMI. In that conversation, Dahms indicated that he called Banafato instead of Auerbach, because Auerbach was on a plane en route to the Hong Kong Toy Fair at the time. At Dahms' suggestion, Banafato called Rosenberg, who advised him that he, too, was submitting his resignation to PMI.
When Auerbach arrived in Hong Kong on December 14, 1991, he received an emergency message from his office, as a result of which he learned that both Dahms and Rosenberg had tendered their resignations to PMI.
Dahms formally tendered his written resignation to PMI by letter dated December 12, 1991, the day after he started at GAF, effective that same day.
Neither Dahms nor Rosenberg could offer a plausible reason for the delay in informing PMI after they had accepted employment with GAF.
At the time that Auerbach learned of Dahms' resignation on December 12, 1991, Dahms had not completed any of the preparations for the January 1992 Hong Kong Toy Fair which Auerbach had relied on him to make.[2] Because of this and Rosenberg's *290 resignation, Auerbach immediately instructed Banafato to telephone PMI's mass market customers to make appointments for the Hong Kong Toy Fair. Despite being disadvantaged by lateness and lack of mass market experience, Banafato telephoned approximately forty customers, and received approximately eight to ten toy fair appointments as a result of those calls.
As of December 14, 1991, PMI had a total of nine toy fair appointments, eight of which had been made by its independent representatives, and one by Dahms. In previous years, PMI typically had forty to forty-five Toy Fair appointments. Dahms did not recall making any toy fair appointments for PMI during the significant first fifteen days of December.
Dahms had sent several memoranda to PMI's sales representatives to prod them to make appointments for the 1990 and 1991 Hong Kong Toy Fairs. He sent out only one such memorandum for the 1992 Hong Kong Toy Fair.
When Rosenberg and Dahms submitted their resignations to PMI, they did not advise PMI whether or with whom they had other employment. Subsequently, Auerbach learned they were working for GAF.
Dahms and Rosenberg, as former high-level employees of PMI, were in a position to do serious damage to PMI while working for GAF.
On or about December 17, 1991, Dahms sent Auerbach a letter requesting a resolution of the terms of his departure. It stated that he had been making Hong Kong appointments for PMI through the prior week; that he could either give negative reports to customers as to why he left PMI or, if he were paid what he was owed, reports that were positive; and that he was leaving because PMI could not "ship."
At the 1992 Hong Kong Toy Fair, Dahms kept appointments with several of PMI's customers on behalf of GAF. Dahms also met with PMI's customers at the February 1992 New York Toy Fair on behalf of GAF.
*291 Shortly after submitting his resignation to PMI, and immediately after he began working for GAF, Dahms wrote letters to several customers he had dealt with at PMI soliciting them for toy fair appointments on behalf of GAF. Thus, in a letter dated December 16, 1991, to a buyer at Nicotoy, Dahms stated as follows:
First, of all, I sincerely hope you remember me. I used to work with Embrace and directly with Jerry Auerbach. I am no longer associated with Embrace. Their problems with late shipping caused me great problems.
Prior to his resignation on December 12, 1991, Dahms had telephoned at least six PMI customers. He also called on these customers on behalf of GAF at the Hong Kong Toy Fair in January 1992. PMI did not have 1992 toy fair appointments with any of them, with the possible exception of Boscov's. Dahms called these customers to make appointments on behalf of GAF while he was still employed by PMI.
Under the Agreement between Dahms and PMI, PMI's "customers" were defined as "customers at the time of the employee's termination of employment" or "who are customers within a year of termination or who are being solicited as customers within a year of termination."
Dahms had contact and communication with forty-five listed customers (the "diverted customers") while employed at PMI that he later sold on behalf of GAF. A substantial proportion of the accounts assigned to Dahms by GAF were developed by him while he was at PMI. Shortly after Dahms' employment by GAF, Haney borrowed Dahms' contact file to develop a computer database.
GAF had a licensed patented product in 1991, squeeze pets, an electronic plush product, for which it had an exclusive license. Its sales in 1991 were very small, but very strong in 1992 and 1993.
As to the forty-five customers at issue, GAF's products, including squeeze pets, were competing for the same customer dollar as PMI's products. Thus, a customer could transfer dollars budgeted *292 for the purchase of a plush product, such as bear bags, to squeeze pets.
In 1992, Dahms or GAF participated in international sales of plush products to the diverted customers totalling $991,541.28. That same year, Dahms or GAF also participated in domestic sales of plush products to the diverted customers totalling $340,015.05.
A comparison of the 1991, 1992 and 1993 sales information indicates continued encroachment on PMI's customers by GAF. PMI was particularly vulnerable to competition from GAF because of its similar products. After Dahms and Rosenberg were employed by GAF, PMI lost sales from several of its regular customers.
GAF contends that its introduction of squeeze pets was the primary reason for its increase in sales in 1992. But its sales to four of the five customers it had been selling in 1991 actually declined in 1992, after the introduction of squeeze pets, a result inconsistent with this assertion.
PMI listed the products that it claims as competitive products for the purpose of establishing its damages. These are plush toys. As already stated, noisemaking plush products, such as GAF's squeeze pets, compete for the same buyers' dollars as products which do not make noise, such as bear bags.
PMI claims as damages the net profits of both GAF Ohio and another Haney corporation, Great American Fun Hong Kong (GAF Hong Kong), from sales to the forty-five diverted customers for 1992 and 1993.
GAF Hong Kong was established as the Great American Fun (H.K.) Buying Office Limited on December 14, 1982. GAF Hong Kong is the principal supplier of GAF Ohio. Haney described GAF Hong Kong as a company which invoices customers on a fee basis on behalf of GAF Ohio. These customers included customers called on by Dahms.
*293 Haney always controlled GAF Hong Kong. He is the beneficial owner of all of the shares.
GAF Hong Kong and GAF Ohio have several customers in common, including several of the customers on the list of accounts at issue, and sell some of the same products. GAF maintains invoices from GAF Hong Kong in its files in the event a customer requires additional product to be restocked domestically by GAF. Although GAF has an exclusive licence for the sale of its squeeze pets, GAF Hong Kong sells squeeze pets without any written sublicense from GAF Ohio.
Dahms acts as both a direct employee of GAF Ohio and a sales representative of GAF Hong Kong. He sells products for the latter. Rosenberg and other persons also provide sales support for GAF Ohio and GAF Hong Kong.
Notwithstanding the fact that Dahms' sales efforts on behalf of GAF Hong Kong may benefit GAF Ohio, the sales are invoiced through GAF Hong Kong. The allocation of overhead expenses between the two corporations involves the exercise of discretion.
GAF increased its letter of credit mass market business substantially after Rosenberg and Dahms became employed there.

Breach of Non-Competition Restrictive Covenant
PMI claims that Dahms breached the post-employment restrictive covenant not to compete (paragraph 7) in the Agreement by soliciting PMI's customers and misappropriating PMI's confidential information, including its sales strategy, customer identities, and pricing policy, thus competing unfairly and wrongfully with PMI, after accepting employment with GAF.
A post-employment restrictive covenant is enforceable to the extent it is "reasonable under the circumstances." Karlin v. Weinberg, 77 N.J. 408, 417, 390 A.2d 1161 (1978); Solari Indus. v. Malady, 55 N.J. 571, 585, 264 A.2d 53 (1970). Among other matters, the court must consider the circumstances in which it was executed and in which it is to apply. To be enforceable, the *294 covenant must satisfy a three-prong test: it must be reasonably necessary to protect the employer's legitimate interests, must not cause undue hardship on the employee and must not impair the public interest. Solari, supra. The validity and enforceability of the covenant is fact-sensitive and must be determined in light of the facts of this case.
GAF contends that the non-competition provision is unenforceable. I am satisfied that, except as hereafter stated, the restrictions in the provision are reasonable in view of all of the circumstances of this case and the applicable law. See Solari, supra, 55 N.J. at 576, 264 A.2d 53; see also Karlin, supra, 77 N.J. at 412, 390 A.2d 1161; Whitmyer Bros. v. Doyle, 58 N.J. 25, 274 A.2d 577 (1971); Schuhalter v. Salerno, 279 N.J. Super. 504, 653 A.2d 596 (App.Div. 1995); Mailman, Ross, Toyes & Shapiro v. Edelson, 183 N.J. Super. 434, 440-42, 444 A.2d 75 (Ch.Div. 1982).
The restrictive covenant here was designed to protect two legitimate interests of PMI: its proprietary and confidential information; and its customer relationships. These interests are legitimately protectable through restrictive covenants. Ingersoll-Rand Co. v. Ciavatta, 110 N.J. 609, 626, 542 A.2d 879 (1988); A.T. Hudson & Co. v. Donovan, 216 N.J. Super. 426, 432-33, 524 A.2d 412 (App.Div. 1987).
When Dahms joined the staff of PMI in April 1988, he came into a key position which of necessity would expose him to PMI's most sensitive corporate information. Unlike other sales agents who PMI employed or with whom it contracted, Dahms had access to customer information of the entire sales force. As Vice President of Sales, he had access to PMI's pricing policy and sales strategy, and assisted in the areas of new product development. Additionally, unlike many sales agents, he did not arrive with his customers; virtually all of his customer relationships were developed on the payroll of PMI. The non-competition covenant which PMI asked Dahms to sign was in recognition of his unique employee status and the damage he could inflict on PMI through the misuse of the knowledge he had acquired there.
*295 Defendants contend that PMI has not proven that they misappropriated its customer confidential information. They assert that the information was not protectable because it was publicly available and not exclusively that of PMI; and that there is no showing that defendants used the information. I find this contention to be without merit.
Under New Jersey law, to be judicially protected, misappropriated information need not rise to the level of the usual trade secret, and indeed, may otherwise be publicly available. The key to determining the misuse of the information is the relationship of the parties at the time of disclosure, and its intended use. Zippertubing Co. v. Teleflex, Inc., 757 F.2d 1401, 1407-10 (3rd Cir.1985) (citing Kamm v. Flink, 113 N.J.L. 582, 175 A. 62 (E & A 1934)); see also Sun Dial Corp. v. Rideout, 16 N.J. 252, 257, 108 A.2d 442 (1954).
The information which PMI seeks to protect is not readily obtainable from trade directories and other publications, as GAF argues. Although the customers' names may be listed in those publications, the fact that they are customers of PMI is not. Their identity is entitled to protection when divulged in confidence to a key employee such as Dahms, where he is a party to a covenant not to compete. See Kamm, supra, 113 N.J.L. at 588-89, 175 A. 62; see also Ingersoll-Rand, supra, 110 N.J. at 628, 542 A.2d 879. The fact that such information may be available from public sources does not mean that the information is not confidential as between the parties. Zippertubing, supra, 757 F.2d at 1410. It should be noted that GAF itself seeks to protect the identity of its customers from disclosure by the noncompetition provision required of its employees, evidencing its recognition of the value of this information.
Additionally, the knowledge which PMI sought to protect through the Agreement went beyond merely the identity of PMI's customers. It sought to protect Dahms' knowledge of the customers' buying habits, PMI's mark-up structure, merchandising plans, sales projections and product strategies. A competitor's knowledge *296 of a particular customer's pricing and packaging requirements actually gives the competitor the ability to design for that customer's needs and to obtain an advantage over competitors who do not have this information. Thus, all of the foregoing information is clearly confidential and proprietary as to PMI, and protectable through a restrictive covenant. See Sun Dial, supra, 16 N.J. at 257, 108 A.2d 442; Restatement (Third) of Unfair Competition section 39, comment d (Tentative Draft No. 4, March 25, 1993), cited in Trump's Castle Assoc. v. Tallone, 275 N.J. Super. 159, 162, 645 A.2d 1207 (App.Div. 1994) ("A trade secret can also relate to ... aspects of business operations such as pricing and marketing techniques or the identity and requirements of customers.")
As in A.T. Hudson, supra, 216 N.J. Super. 426, 524 A.2d 412, PMI expended substantial energy and money, either through Dahms or otherwise, in soliciting the actual customers involved herein  a matter "worthy of protection." Id. at 434, 524 A.2d 412. That the customers may have been available from trade periodicals and the like does not change the fact that they were actually divulged by Dahms to GAF, a competitor, in violation of a confidence established by the covenant. Knowledge thereof, was, in fact, acquired by GAF in violation of the covenant  not through any such periodicals. See Kamm, supra, 113 N.J.L. at 588-89, 175 A. 62.
The fact that GAF had known, dealt with or solicited many, if not all, of the accounts at issue in this case before hiring Dahms is of no consequence. It is evident that the sales to these customers increased after Dahms was employed, through the use of his knowledge of information as to his and PMI's relationships with such customers. Dahms and Rosenberg, PMI's key employees, were hired by GAF in order for it to make use of such knowledge, information and relationships so as to increase GAF's business in the mass market field, at PMI's expense, and, as to Dahms, in violation of his restrictive covenant. Clearly, Dahms' sharing of the customer knowledge and relationships he had gained from his *297 experiences at PMI with his new employer and selling to such customers on behalf of GAF were in breach of the covenant.
Dahms has admitted the use of such confidential information in discussing accounts with GAF generally, and in preparation for the Hong Kong Toy Fair. GAF plainly misappropriated PMI's confidential customer information through Dahms' disclosure to it of such customers and solicitation of them on its behalf. Even if Dahms did not disclose to GAF any of PMI's confidential information relating to such customers, he violated the covenant not to compete by disclosing to GAF PMI's existing customers and selling to them for GAF.
Dahms immediately began soliciting PMI's existing customers, and selling GAF's products to the customers he had dealt with at PMI after he resigned, if not before. Indeed, of the more than one hundred customers Dahms was assigned to service at GAF, all but twelve were customers he had dealt with at PMI. The introduction of these customers to a competitor and sales to them by that competitor violated the covenant not to compete and proximately caused damage to PMI.
In any event, the relationships PMI had with its customers are clearly protectable under the law. A.T. Hudson, supra, 216 N.J. Super. at 433, 524 A.2d 412. As in Solari, Dahms had a high executive position with PMI. By the covenant, he is barred from dealing with PMI's actual customers with which he had substantial dealings on PMI's behalf while in its employ, or actual customers of PMI of whom he acquired knowledge while in that employ. The relationships which Dahms had with PMI's customers were developed and nurtured at PMI's expense.
GAF claims that it solicited all of the diverted customers (those PMI customers to which it sold plush toys after hiring Dahms) for years prior to hiring Dahms (with one exception); that it had sold merchandise to virtually all of these accounts prior to hiring Dahms; and that in 1992 its sales to them were largely of copyrighted and licensed squeeze pets. But solicitation does not equate with sales. Additionally, in 1991, GAF sold domestically to *298 only five of the diverted customers; and after Dahms' employment by GAF, this number increased to twenty-three of such customers in 1992 and to thirty-two of them in 1993.
Further, although squeeze pet sales may have increased in 1992 and 1993, as I have found, squeeze pets were indeed competitive with products sold by PMI. There is no question but that Dahms' solicitation and acquisition of the diverted customers proximately caused the increase of sales to them by GAF, and the resulting profit to GAF, even of squeeze pets.
The prohibition in the covenant, however, to the extent it covers prospective customers that were only solicited by PMI, is overbroad and, thus, unenforceable. See Coskey's T.V. & Radio Sales and Service v. Foti, 253 N.J. Super. 626, 638-39, 602 A.2d 789 (App.Div. 1992). Such overbreadth does not make the entire covenant unenforceable. The covenant is simply modified to delete that prohibition. See Solari, supra. Thus, those customers on the diverted customer list that were merely solicited and not sold by PMI while Dahms was employed  e.g., Drug Emporium  will not be considered in awarding PMI damages. See United Board & Carton Corp. v. Britting, 63 N.J. Super. 517, 524, 530, 164 A.2d 824 (Ch.Div. 1959), aff'd, 61 N.J. Super. 340, 160 A.2d 660 (App.Div.), certif. denied, 33 N.J. 326, 164 A.2d 379 (1960).
PMI is not precluded from protecting its customer relationships simply because they are nonexclusive, as defendants claim. There is nothing in the Solari line of cases that in any wise suggests that the customers protected must be exclusively those of the employer. See Solari, supra; Hogan v. Bergen Brunswig Corp., 153 N.J. Super. 37, 42, 378 A.2d 1164 (App.Div. 1977).
Thus, the covenant, as modified, is reasonably necessary to protect PMI's legitimate interests.
The restrictive covenant does not cause undue hardship on Dahms. It does not impose any limitations on his ability to work for a competing business nor does it prevent him from *299 engaging in his livelihood.[3] He has not been forced to move; he is free to do business on an international and domestic basis, and to work for anyone in the toy industry, even GAF, as long as he does not exploit the customer relationships and other confidential information, relating thereto, he acquired through PMI. Coskey's, supra, 253 N.J. Super. at 636-40, 602 A.2d 789; A.T. Hudson, supra, 216 N.J. Super. at 428-29, 524 A.2d 412. All of the customer relationships which Dahms took with him to GAF were acquired through his employment with PMI. Accordingly, PMI's use of the restrictive covenant to keep such customer relationships protected from competitive use by Dahms is reasonable and does not result in undue hardship on him.
The time restraint here as to such competition is also reasonable  one year; and the failure to restrict the geographical area is not significant, since the provision essentially sought to protect existing customer relationships rather than a territorial sphere of influence. Schuhalter, supra, 279 N.J. Super. at 511, 513, 653 A.2d 596 (citing Mailman, supra).
Further, contrary to GAF's contention, the mass market customers for the toys involved here are not so limited in number or generally known in the trade as to preclude protection against GAF's dealing with them during that one-year period, provided they were existing customers of PMI before Dahms left its employ. Their patronage had to be developed by PMI or Dahms, often as a result of a personal relationship. This situation is not in any wise similar to the finite group of customers dealt with by all competitors in the field, as in Coskey's, supra, 253 N.J. Super. at 638-39, 602 A.2d 789. Nor is it at all like that in Whitmyer, supra, where the plaintiff's customers were governmental entities and public bidding was involved. The Court there held that "[t]he industry as a whole is fully aware when public work is available *300 and the determining factor is generally price rather than personal consideration." 58 N.J. at 38, 274 A.2d 577.
Finally, defendants have not presented any reason peculiar to Dahms' circumstances or the industry which makes Dahms' covenant void as against public policy. It does not, as GAF contends, effectively stifle competition in the mass market for toy customers. That market is not limited. Nothing in the covenant prohibits the customers from seeking out GAF and purchasing GAF's toys, as long as such customers were not existing customers of PMI for plush toys when Dahms was employed by it. The one-year anti-competition restriction is reasonable, has no potential for any harmful consequences for Dahms, and is clearly necessary to protect the legitimate interests of PMI.
I hold, therefore, that the covenant, measured by the Solari-Whitmyer factors, as modified above, is valid and enforceable.
I find that GAF, through Haney, was aware of, or chargeable with knowledge of, the existence of the restrictive covenant and its viability in December 1991, when he first met with Dahms, a significantly important and knowledgeable managerial key employee of PMI. This conclusion is based on the finding, heretofore made, of Haney's wilfull blindness as to the existence of the covenant, particularly since he, himself, required such a covenant of his employees. Thus, GAF is properly liable for the proximate consequences of the breach of that covenant which enured to its benefit, even though it might otherwise have acquired the increased business from the customers by its own efforts. See Raven v. A. Klein & Co., 195 N.J. Super. 209, 215, 478 A.2d 1208 (App.Div. 1984) (quoting A. Hollander & Son, Inc. v. Imperial Fur Blending Corp., 2 N.J. 235, 250, 66 A.2d 319 (1949)).
Dahms endeavored to free himself from the non-competition provision in the Agreement by giving a notice in March 1987 that he did not wish to renew the Agreement for any period beyond its termination date of April 17, 1991, but wished to continue his employment with PMI without the Agreement. This *301 unilateral attempt to divest himself of the covenant's burden by endeavoring to create an employment relation not covered by the existing Agreement, was legally ineffective.
Although paragraph 9 of the Agreement provided that it "may" be renewed for additional one-year periods upon the same terms and conditions, after its initial three-year term, it obviously must have contemplated an automatic renewal for such periods; for, it provides only the method to express an intent not to renew, rather than the steps a party must take to renew the Agreement.[4] Clearly, to preclude an automatic one-year renewal of the Agreement, a written notice to PMI of at least sixty days prior to April 18, 1991, was required. The word "may" is not at all ambiguous. See Otis Elevator Co. v. George Washington Hotel Corp., 27 F.3d 903 (3rd Cir.1994). Dahms' purported notice of non-renewal was submitted only thirty-five days prior to the above date.
The crux of Dahms' problem was not that he did not understand that he needed to take action because of an ambiguity, but rather that there were no longer the required sixty days left for him to give notice. Clearly, it was Dahms' own oversight that created this timing difficulty and not any ambiguity.
Dahms' attempt by his late notice of non-renewal to terminate the Agreement without termination of employment was, as stated, without any legal effect.
The construction urged by defendants, which would permit Dahms unilaterally to terminate the Agreement while maintaining his employment, is contrary to the Agreement's purpose  to regulate the terms and conditions of Dahms' employment. Such a construction also would deprive plaintiff of any opportunity to protect itself either by having advance notice of the employee's termination of the contract as required by paragraph 9, or by having the benefit of the post-employment restrictions therein.
*302 It should be noted that Dahms, himself, in his private memoranda, continued to refer to the Agreement for the override bonus benefits due him. A construction of the Agreement which would permit Dahms to thus have the best of both worlds, without PMI's consent, is fundamentally unfair and does not comport with a reasonable interpretation of the Agreement. He cannot repudiate the Agreement relative to his obligations, and continue to rely on its benefits.
Accordingly, the notice not to renew may be fairly read as a proposal for modification of the Agreement, conditioned upon Dahms' presentation of a later proposal for Auerbach's review. Auerbach reasonably interpreted the notice, after receipt of a simultaneous telephone call from Dahms, as Dahms' wanting to continue his employment, but under a new contract with proposed terms that Dahms was to submit, including increased compensation. Dahms never submitted the proposed new contract terms.
Thus, the covenant not to compete continued as part of Dahms' non-terminated Agreement and was effective before and after his resignation on December 12, 1994.
GAF's argument of waiver or acquiescence by PMI is without substance. Such waiver or acquiescence would occur only if PMI knew or should have known that the notice was intended to terminate the Agreement and the provisions applicable to Dahms' employment, such as the noncompetition covenant. See West Jersey Title and Guar. Co. v. Industrial Trust Co., 27 N.J. 144, 152, 141 A.2d 782 (1958). But PMI reasonably had no such understanding, and indeed, Dahms in his telephone conversation with Auerbach could be said to have discouraged such an understanding.
The delay in giving notice was not slight; and there is no evidence of fraud, surprise, honest mistake or other equitable considerations warranting relief from the untimely notice. Here, forgetfulness was the reason for the delay in sending the termination notice. This does not suffice to excuse the lack of timeliness. *303 Brick Plaza, Inc. v. Humble Oil & Ref. Co., 218 N.J. Super. 101, 526 A.2d 1139 (App.Div. 1987); Sosanie v. Pernetti Holding Corp., 115 N.J. Super. 409, 414, 279 A.2d 904 (Ch.Div. 1971). PMI cannot be said to have waived its rights to be given timely notice of non-renewal, when it reasonably did not realize that such notice was intended.
Further, the failure to pay the bonus override to Dahms is not so material a breach as to warrant his failure to perform the covenant not to compete. See Nolan by Nolan v. Lee Ho, 120 N.J. 465, 472, 577 A.2d 143 (1990).

Breach of Duty of Loyalty
PMI claims that, in addition to his breach of the covenant not to compete, Dahms breached his duty of loyalty as an officer and employee of PMI. It further claims that Rosenberg, who had no covenant, also breached his duty of loyalty. These claims have merit.
Although an employee has the right to make preparations to go into a competing business even while he is still employed, he may not breach the undivided duty of loyalty he owes his employer while still employed, by soliciting his employer's customers or other acts of secret competition. Auxton Comp. Enter. v. Parker, 174 N.J. Super. 418, 423, 416 A.2d 952 (App.Div. 1980).
At one of the meetings held at GAF prior to his resignation, Dahms discussed the accounts he was calling on for PMI. Subsequently, he began to contact customers on behalf of GAF prior to submitting his resignation to PMI. Such conduct constituted proscribed acts of secret competition.
Courts have recognized the damage a former disloyal employee is able to inflict on his employer, even in the absence of a covenant, where he has launched or assisted a competing business while he is employed. See United Board, supra, 63 N.J. Super. at 527, 164 A.2d 824.
*304 It is undisputed that both Dahms and Rosenberg had meetings with GAF, and that they accepted employment with GAF some days before they gave PMI notice of their resignations. I find that GAF actively wooed these two key executives of PMI, engaged in sales, at least as early as October 1991; and that Dahms and Rosenberg attended at least two meetings at GAF for the purpose of discussing the reassignment of PMI's customers before they had submitted their resignations. Both Rosenberg and Dahms breached the duty of loyalty to PMI by so doing.
Like the salesman in United Board, Dahms concealed his intentions from his employer until he could inflict severe damage. While Dahms was so involved with GAF, he was neglecting his duty to PMI to make Toy Fair appointments during the critical period in early December. In fact, on one day  December 11, 1991  Dahms was actually employed by both PMI and GAF.
It may be reasonably inferred from Dahms' conduct that he deliberately delayed making appointments for PMI, hoping instead that he would be able to convert them to GAF. I find that his telephone calls to customers of PMI were actually for Toy Fair appointments for GAF, not PMI. Additionally, Dahms wrote letters, immediately after he went to work for GAF, to PMI customers criticizing PMI. Further, the surreptitious manner in which Dahms and Rosenberg acted in resigning immediately before the Toy Fair and not advising PMI that they were going to work for GAF, supports the foregoing conclusion. Since almost fifty-five percent of PMI's annual sales revenue is derived from its presentations at the Hong Kong Toy Fair, the resulting decline in its appointments for the January 1992 Hong Kong Toy Fair caused it severe damage.
Dahms and Rosenberg defected to GAF, a bitter competitor of PMI, which had previously been charged in a law suit with unfairly competing with PMI by using its proprietary information. The day after Dahms announced his resignation from PMI, he immediately began telecopying PMI's customers to make the toy fair appointments on behalf of GAF that he should have made for *305 PMI. He thus sought to convert the goodwill established by him for PMI to the benefit of GAF. Dahms' conduct plainly violates the covenant not to compete and, to the extent it occurred prior to his resignation, violates as well his duty of loyalty to PMI.
Further, Rosenberg's conduct in assisting GAF's efforts to solicit Dahms, PMI's key sales executive, as an employee, was a violation of his duty of loyalty to PMI. See Wear-Ever Alum., Inc. v. Townecraft Indus., 75 N.J. Super. 135, 182 A.2d 387 (Ch. Div. 1962); see also Trans Am. Truck. Serv. v. Ruane, 273 N.J. Super. 130, 641 A.2d 274 (App.Div. 1994) (defendant had solicited a customer of his employer as well as several fellow employees for a proposed new business while still employed; the court referred to such conduct as "wrongful" acts).
The solicitation here by Rosenberg, a fellow key employee of PMI, for a competing business, GAF, is a breach of the duty of employee loyalty. This activity deprived PMI of the ability to take any counter-measures, thereby resulting in the loss of Dahms, a key employee, and many of its customers.
Thus, Dahms and Rosenberg, while still employed by PMI and enjoying its trust and the benefits of their employment, in effect went into secret competition with their employer. United Board, supra, 63 N.J. Super. at 530, 164 A.2d 824. In view of the intense competition between PMI and GAF, their conduct furthered GAF's competitive advantage while they were still employed by PMI, a clear breach of their duty of loyalty to PMI. Id. at 524, 164 A.2d 824.

Tortious Interference with Economic Advantage
PMI correctly contends that Dahms, Rosenberg and GAF also tortiously interfered with PMI's prospective economic advantage. As set forth in Printing Mart-Morristown v. Sharp Elec. Corp., 116 N.J. 739, 751, 563 A.2d 31 (1989), the elements of a cause of action for tortious interference are: (1) plaintiff must have a reasonable expectation of economic advantage (i.e., plaintiff was "in pursuit of business"); (2) the interference and harm *306 inflicted must be done intentionally and with "malice," not necessarily in the sense of ill will, but in the sense of conduct that is wrongful and without justification or excuse under all the circumstances; (3) the interference must have caused a lost prospective gain; and (4) the loss or injury caused damage. Plaintiff must show that if there had been no interference, there was a reasonable probability that it would have received the anticipated economic benefits.
The question of "malice," or "improper means" is factual, to be determined on a case-by-case basis. "The standard must be flexible and must focus on a defendant's actions in the context of the case presented." The ultimate question is whether a defendant's conduct is sanctioned by the "rules of the game." Sustick v. Slatina, 48 N.J. Super. 134, 144, 137 A.2d 54 (App.Div. 1957).
I find that there was a deliberate plan on the part of GAF, Dahms and Rosenberg to cause damage to PMI through the diversion of its customers at a time critical to PMI in selling to these customers.
Only a few months after the settlement with PMI of contested litigation, GAF contemplated the expansion of its mass market division  the area where most of PMI's sales are made  utilizing key members of PMI's sales force. GAF diligently pursued employment of Rosenberg. Dahms and Rosenberg, while still on PMI's payroll, met with GAF to discuss GAF's plans of expanding into the mass market, starting with the 1992 Hong Kong Toy Fair. GAF intentionally sought to hire Dahms and Rosenberg away from PMI in order to seriously impair PMI's business while increasing its own.
Dahms neglected his duty to PMI to make 1992 Toy Fair appointments, depriving PMI of the ability to meet with its customers at the principal sales event of the year. The announcement to PMI of the planned departures and resignations of Dahms and Rosenberg was delayed until PMI's principal, Auerbach, was *307 en route to Hong Kong, making it difficult for PMI to contact customers and find substitute sales help for the Toy Fair. Dahms immediately began the solicitation of PMI's customers, and, in the process, made negative statements about PMI.
The foregoing pattern of conduct demonstrates not only legal, but actual malice. See Printing Mart, supra, 116 N.J. at 756-60, 563 A.2d 31. The acts of GAF to increase its business by intentionally seeking out and employing PMI's key sales employees, so that it could sell to PMI's existing customers by reason of the customer information they had, constituted intentional wrongful acts committed without justification or excuse. That conduct is not sanctioned by the rules of the game. It is not justified merely because GAF is a competitor motivated by profit. Additionally, GAF acted out of ill will towards PMI with the actual intent to harm its business. Its actions were predatory in nature. The addition of ill will exacerbates the nature of the wrong. See Middlesex Concrete Prod. and Excav. Corp. v. Carteret Indus. Ass'n, 37 N.J. 507, 519, 181 A.2d 774 (1962).
The employment of Dahms and Rosenberg and their conduct in assisting GAF were certainly not routine business activities, as claimed by defendants. See Wear-Ever, supra, 75 N.J. Super. at 145, 182 A.2d 387.
GAF cannot be said to have acted "in the exercise of an equal or superior right" when it interfered with PMI's economic advantage by seeking out and hiring PMI's two key employees, misusing the customer information Dahms was bound to keep confidential, and taking advantage of Dahms' wrongful conduct at a crucial time in the business year  in order for GAF to increase its business at PMI's expense. See Kamm, supra, 113 N.J.L. at 588-89, 175 A. 62.
The activities of defendants were clearly tortious. They proximately caused PMI damage and loss. As a direct result thereof, PMI lost business from its existing customers that was diverted to GAF. The interference caused the loss of prospective gain by PMI and damages to it.
*308 Rosenberg and GAF also tortiously interfered with Dahms' employment relationship with PMI. GAF's tactics here were similar to those used in Wear-Ever, supra, 75 N.J. Super. 135, 182 A.2d 387. Rosenberg was recruited by GAF; then, without disclosing his new affiliation to PMI, he was used to recruit Dahms. This deception permitted Rosenberg to persuade Dahms to resign, and deprived PMI of the opportunity to counteract the hidden influence that emanated from GAF.

Damages
Damages to PMI proximately resulting from defendants' wrongs, measured by an accounting of profits to GAF on sales made to the diverted customers after Dahms was hired by GAF, are appropriately allowed in this case, involving essentially unfair competition  a wrongful acquisition of PMI's customers in violation of a covenant not to compete and by intentional interference with PMI's prospective economic advantage. Imperial Fur, supra, 2 N.J. at 250-51, 66 A.2d 319; A. Hollander & Son v. Philip A. Singer & Bro., 119 N.J. Eq. 52, 69-72, 180 A. 671 (Ch. 1935), aff'd, 120 N.J. Eq. 76, 183 A. 296 (E & A 1936); see also Zippertubing, supra, 757 F.2d at 1411; Adolph Gottscho, Inc. v. American Marking Corp., 26 N.J. 229, 237, 139 A.2d 281 (1958). This form of relief represents compensation computed and measured by the same rule that applies to cases of a trustee who has wrongfully used the trust property for his own advantage. Philip A. Singer, supra, 119 N.J. Eq. at 69, 180 A. 671. It has also been described as a remedy consistent with constructive trust principles, the accounting for profits being a special form of constructive trust. It effects the policy of discouraging tortious or wrongful conduct by depriving the wrongdoer of the opportunity to profit from wrongdoing. Zippertubing, supra.
Here, the real harm to PMI is the unfair advantage gained by GAF in competing for customers. The profits to GAF from such sales are a reliable indication of the value of that unfair advantage.
*309 PMI has supplied evidence sufficient to estimate damages with a reasonable degree of certainty. Wong v. Mercado, 248 N.J. Super. 215, 232, 590 A.2d 723 (Law Div. 1991). The report and testimony of its expert, Barry Pierce, essentially satisfied its burden of proving damages.
There is a substantial rise in the number of the customers at issue (the diverted customers) to which GAF sold products in 1992 and 1993, after Dahms began his employment for GAF. This cannot be explained away by reason of the advent of GAF's new product  squeeze pets. It is not at all improbable that squeeze pets may have been sold to the diverted customers through the efforts of Dahms.
PMI claims that GAF Hong Kong's profits on plush sales in 1992 should be considered in calculating its damages. Defendants, however, maintain that GAF Hong Kong is a separate entity from GAF Ohio and, thus, it would be inappropriate to consider GAF Hong Kong's profits. GAF Hong Kong is not a party to this action.
As heretofore discussed, Haney is the sole beneficial owner of the shares of both corporations. GAF Ohio exercises complete corporate dominance over GAF Hong Kong. They use common agents, common sales representatives, including Dahms and Rosenberg, and have common products and customers. It is some significance that the method of allocating overhead expenses between the two companies is entirely discretionary and their relationship is very informal.
It is a reasonable inference from the findings, heretofore made, as to the relationship between GAF Ohio and GAF Hong Kong that, for the purpose of determining profits on sales to the diverted customers, sales made or invoiced by GAF Hong Kong are properly imputed to GAF Ohio, assuming the same profit *310 margin of Ohio applied to Hong Kong.[5] Dahms acted as a sales representative of GAF Hong Kong in effecting sales to the diverted customers in violation of PMI's rights. Both Dahms and Rosenberg provide sales support for both GAF Hong Kong and GAF Ohio. Despite their being separate corporations, both corporations were run by Haney as one enterprise with respect to the services of Dahms, as well as Rosenberg.
Thus, GAF Hong Kong was an agent of GAF Ohio, acting on behalf of the latter, in wrongfully violating PMI's rights. Further, for the purpose of computing damages sustained by PMI, under the circumstances of this case, it is entirely appropriate to consider GAF Hong Kong to be the alter ego of GAF Ohio and to pierce the corporate veils of both entities for a just and equitable result. Stochastic Dec., Inc. v. DiDomenico, 236 N.J. Super. 388, 393-95, 565 A.2d 1133 (App.Div. 1989), certif. denied, 121 N.J. 607, 583 A.2d 309 (1990); cf. Adolph Gottscho, supra, 26 N.J. 229, 139 A.2d 281.
With respect to PMI's claim against GAF, I find that the Hong Kong corporation was a mere instrumentality of Haney's other corporation  GAF Ohio; and that a refusal to consider GAF Hong Kong's sales here would permit an independent corporation to be used to defeat the ends of justice. See State, Dep't of Environmental Prot. v. Ventron Corp., 94 N.J. 473, 500, 468 A.2d 150 (1983); O'Neal & Thompson, O'Neal's Close Corp. section 1.10, p. 48 (3rd ed.) (piercing the corporate veil is an equitable doctrine that is applied to particular fact situations; that a corporation's separateness is disregarded in one situation does not mean that its separateness will not be respected in other situations.)
GAF's reliance on Sandler v. Lawn-A-Mat Chem. & Equip. Corp., 141 N.J. Super. 437, 454-57, 358 A.2d 805 (App.Div.), certif. denied, 71 N.J. 503, 366 A.2d 658 (1976), is misplaced. The fact pattern there is very different from that here. Through GAF *311 Hong Kong and Dahms, GAF Ohio converted Dahms' relationships with PMI's customers to its advantage.
PMI's computation of net profit is flawed, since it does not take into account GAF's general overhead costs or administrative expenses, and included international sales to customers not on the diverted customer list.
It has been predicted in federal cases that the New Jersey Supreme Court would hold that where the plaintiff's overhead or fixed expenses are not affected by the defendant's breach, no deduction therefor should be made in calculating the net profits plaintiff would have made but for the breach; for while these items are all paid from the proceeds of the business, they do not necessarily bear such a direct relationship to any individual transaction to be considered a cost in ascertaining lost profits.
The same rule applies where a wrongdoer is asked to disgorge profits. "The wrongdoer should not be permitted, by misappropriating another's opportunity, to use that opportunity in order to help absorb fixed expenses of its own business." Zippertubing, supra, 757 F.2d at 1412 ("[I]t is apparent that the fixed expenses of a business must be paid out of profits remaining after all direct costs have been paid. Unless damages restore the latter amount to plaintiff, it will not be fully compensated for the breach.")
Of course, I have no quarrel with the prediction of these federal cases as to New Jersey law, and their rationale. But New Jersey cases have emphasized the need to guard against allowing the computation of profits without regard to deduction of applicable operating and other expenses. See Wasserman's Inc. v. Township of Middletown, 137 N.J. 238, 254-58, 645 A.2d 100 (1994); Cromartie v. Carteret Sav. & Loan, 277 N.J. Super. 88, 103, 649 A.2d 76 (App.Div. 1994); J.L. Davis & Assoc. v. Heidler, 263 N.J. Super. 264, 275-77, 622 A.2d 923 (App.Div. 1993); see also Apex Metal Stamping Co. v. Alexander & Sawyer, Inc., 48 N.J. Super. 476, 482-87, 138 A.2d 568 (App.Div. 1958).
*312 There is evidence from GAF that its overhead expenses are not fixed, but vary with sales volume; and that to the extent that the addition of the diverted customers increased general administrative expenses, it is appropriate to deduct a portion of those costs.
In view of the foregoing New Jersey cases, caution dictates that a reasonable amount be deducted for GAF's overhead in determining the net profits obtained by GAF from sales to diverted customers to which PMI is entitled. GAF has indicated, through expert testimony, that eighteen and one-half percent of the sales is an appropriate deduction. I am not bound by that testimony. In re Guardianship of J.C., 129 N.J. 1, 24, 608 A.2d 1312 (1992); County of Middlesex v. Clearwater Village, Inc., 163 N.J. Super. 166, 174, 394 A.2d 390 (App.Div. 1978), certif. denied, 79 N.J. 483, 401 A.2d 239 (1979).
After a review of all of the evidence relating to damages based on such net profits and a careful analysis of GAF's selling, general and administrative expenses from 1988 to 1992, I am satisfied that eighteen and one-half percent is much too high. Considering, among other things, an averaging of general and administrative expenses (less commissions) as a percent of total sales during this five-year period, I find that a reasonable overhead figure should be no more than twelve percent of the sales involved. That is the amount that will be deducted.
PMI chose a measure of damages based not on its loss of net profits by reason of defendants' wrongdoing but, rather, based on an accounting of net profits made by GAF as a proximate result thereof. This is, as indicated, an appropriate measure of damages in this type of case.
PMI, however, is only entitled to one year's net profits  1992  and not for 1993 as well. The period of the covenant not to compete is for one year after Dahms' resignation in December 1991. The significant harm done to PMI occurred in the first year after the January 1992 Hong Kong Toy Fair. Moreover, it was the failure of Dahms to set up customer appointments for the Fair *313 and, instead, to deal with PMI customers, immediately before, during and after the Fair, on behalf of GAF, that constituted the essential wrong encompassed by PMI's tortious interference claim. GAF's profit for one year suffices reasonably to compensate PMI in damages for that wrong.
PMI's damages based on GAF's 1992 net profits on plush sales are calculated, after allowing for all of the foregoing adjustments, to be $121,832. [Actual calculations are omitted.] The amount of damages awarded against GAF is thus $121,832.

Non-Liability of Rosenberg
I have already found that PMI treated Rosenberg shabbily while he was employed there. Rosenberg had no covenant not to compete. However, had he been bound by such a covenant, it would not be enforceable by reason of PMI's inequitable conduct towards him. See Solari, supra, 55 N.J. at 586, 264 A.2d 53 (if the employer deals with the employee unworthily or in an inequitable manner, it is disqualified from relief in enforcing the covenant not to compete). Although he violated his duty of loyalty to PMI in disclosing customer information to GAF and in assisting it to hire Dahms away from PMI, and was a party to the tortious interference involved herein, I find that PMI's unfair treatment of Rosenberg while he was employed there bars PMI from any relief against him for such wrongful conduct. A judgment of no cause for action will be entered in favor of Rosenberg.
Rosenberg's personal defense does not in any wise relieve GAF of liability for damages.

Dahms' Counterclaim
Dahms is entitled on the counterclaim to recover from PMI the $21,340 incentive bonus override due him for 1991. It was compensation for work he had already earned before he committed a material breach of the Agreement or his duty of loyalty to PMI, or became involved in tortiously interfering with PMI's economic advantage. The method of computing the bonus *314 had been agreed upon by PMI and Dahms. It was fully earned. See Imperial Fur, supra, 2 N.J. at 251, 66 A.2d 319 (in denying the employee the retention of salary paid to him, the Court stated that these "payments were made at a time when he was actively pursuing outside business activities contrary to the employment agreement"); In re Estate of Gregoriou, 153 N.J. Super. 44, 45-46, 378 A.2d 1168 (App.Div. 1977), (where the bonus had not been earned or vested.) See also Joseph Toker, Inc. v. Cohen, 67 N.J. Super. 68, 169 A.2d 838 (App.Div. 1961). Under the circumstances of this case, the rule that a party's material breach excuses the other party from performing a contractual duty due thereafter is not applicable. See Nolan, supra, 120 N.J. at 472, 577 A.2d 143; Duall Bldg. Rest., Inc. v. 1143 East Jersey Ave. Assoc., 279 N.J. Super. 346, 365-66, 652 A.2d 1225 (App.Div. 1995).

Dahms' Secondary Liability
Dahms is liable for the $121,832 in damages awarded against GAF, less the $21,340 due on his counterclaim for the override bonus from PMI. Thus, the net amount for which he is liable is $100,492.
GAF was the aggressor in inducing Dahms and Rosenberg, the two key employees of PMI, to leave PMI and work for GAF, in order to increase its mass market sales and customers at PMI's expense and with the desire to harm PMI. Such predatory unfair competitive tactics make GAF primarily liable to PMI for the damages assessed. The judgment against Dahms shall be payable only if GAF fails to pay or otherwise satisfy the judgment against it. This liability will be deemed secondary to that of GAF. Cf. Mandelbaum v. P & D Printing Corp., 279 N.J. Super. 427, 440, 652 A.2d 1266 (App.Div. 1995); Moss v. Jones, 93 N.J. Super. 179, 184, 225 A.2d 369 (App.Div. 1966) (citing Pennsylvania Greyhound Lines v. Rosenthal, 14 N.J. 372, 385, 102 A.2d 587 (1954) and Losito v. Kruse, 136 Ohio St. 183, 24 N.E.2d 705 (Ct. 1940)). Dahms may not collect on his counterclaim until GAF pays or *315 otherwise satisfies its judgment. The judgment entered herein will so provide.

CONCLUSION
Predicated on the foregoing findings of facts and conclusions of law, judgment will be entered today as follows:
1. Judgment against defendant, Great American Fun Corp., and in favor of plaintiff, Platinum Management, Inc., d/b/a Embrace, in the sum of $121,832.
2. Judgment against defendant, Brian Dahms, and in favor of plaintiff, Platinum Management, Inc., d/b/a Embrace, in the sum of $100,492; but such judgment may only be enforced against Dahms in the event that Great American Fun Corp. does not pay or otherwise satisfy the judgment against it by July 1, 1995. Liability on this judgment against Dahms shall be deemed secondary to that of Great American Fun Corp. on the judgment against it. This judgment against Dahms reflects a recovery on a counterclaim in his favor of $21,340. He may not collect on this counterclaim until Great American Fun Corp. pays or otherwise satisfies its judgment as hereinabove provided.
3. Judgment of no cause for action against plaintiff, Platinum Management, Inc., d/b/a Embrace in favor of defendant, Martin M. Rosenberg.
No costs will be allowed to any party.
NOTES
[1] Dahms was employed by GAF pursuant to "An Agreement of Confidentiality and Noncompetition" dated December 6, 1991. The agreement contained the following clause:

It is specifically understood by employee that all customer lists, invoices, and any other records of whatever nature and kind pertaining to customers of employer are trade secrets and proprietary information and are the exclusive property of employer.
[2] PMI begins its preparations for the Hong Kong Toy Fair by starting to make appointments with buyers in October. The majority of those appointments are made within the first fifteen days of December.
[3] Nor is there any evidence that he was dealt with by PMI so unworthily or in such inequitable manner as to disqualify PMI from enforcing the noncompetition provision. The matter of the debt due Dahms based on the 1991 override bonus is not such a disqualifying factor. See discussion hereafter.
[4] Paragraph 10 provides that employment shall terminate upon the happening of the earliest of three events, the only one applicable here being the resignation of Dahms as an employee.
[5] This assumption made by PMI's expert has not been rebutted by any proofs submitted by GAF.